ARTEMIDE SpA and Artemide Inc., Plaintiffs,

v.

GRANDLITE DESIGN AND MANUFACTURING CO., LTD., Grandrich Corporation, Lightolier Inc., d/b/a Basic Concept, a division of Bairnco Corporation, Laytner's Linen Shop, and Jensen–Lewis Company, Inc., Defendants.

No. 87 Civ. 3178 (JMC).

United States District Court, S.D. New York.

June 18, 1987.

Gottlieb, Rackman & Reisman, P.C., George Gottlieb, Amy Goldsmith, New York City, for plaintiffs.

Weiss, Dawid, Fross, Zelnick & Lehrman, P.C., Allan Zelnick, New York City, Sheldon & Mak, Surjit P. Soni, Pasadena, Cal., for defendant Grandrich Corp.

Colvin, Miskin Basseches & Mandelbaum, Howard F. Mandelbaum, New York City, for defendants Basic Concept Ltd. and Dolek, Inc., d/b/a Laytner's Linen Shop.

## MEMORANDUM AND ORDER

CANNELLA, District Judge.

Plaintiffs' motion for a preliminary injunction is granted in part and denied in part. Fed.R.Civ.P. 65(a). Grandrich's motion to dismiss for lack of personal jurisdiction is denied. Fed.R.Civ.P. 12(b)(2). Its motion to dismiss for improper venue is granted. Fed.R.Civ.P. 12(b)(3).

### BACKGROUND

This is an action for trade dress infringement and unfair competition. Plaintiffs Artemide SpA and Artemide Inc. are the manufacturer and exclusive United States distributor respectively of the "Tizio" lamp. Defendant Grandlite Design and Mfg. Co. ["Grandlite"] manufactures the "Pargido" lamp, which is distributed in the United States by defendants Grandrich Corporation ["Grandrich"] and Basic Concepts.[1] Defendants Laytners Linen Shop ["Laytners"] and Jensen–Lewis Company Inc. ["Jensen–Lewis"] are retailers.

Plaintiffs allege that the Pargido is a "knock off" of the Tizio design. They assert claims under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and under New York and California law. They seek preliminary and permanent injunctive relief against sale by the defendants of the Pargido lamp.

The Tizio lamp, made in Italy, is a halogen desk lamp with articulated supports. The lamp has a cylindrical base which rotates on a circular platform. Toward the bottom of the base are two sets of vertical ventilators. On the top of the base is a single set of ventilators, and a red on/off switch which regulates a transformer housed in the base. From the base rise two thin and flat metallic struts, firmly mounted to the sides, parallel to each other and separated by the width of the diameter of the base. A set of two parallel metallic arms, also thin and flat, but more than twice as long as the struts, pivot freely from the top of the struts, with each arm

---

1. The complaint originally named Lightolier, Inc. d/b/a Basic Concepts. In the course of these proceedings it was determined that Lightolier and Basic Concepts are sister corporations.

Accordingly, plaintiffs have indicated that they will amend the complaint to name only Basic Concepts.

joined to one strut. At the joint a chrome-colored metallic pin-like spacer runs between the two arms. At either end of the spacer is a red cone-shaped insulator. From the joints, the arms extend in each direction, although the distance at one end is about one-half of that at the other. At the shorter end, the arms are connected to a curvilinear counterweight. At the other end, a second set of two parallel arms is joined in the same pivoting fashion as the first set is connected to the struts. At this joint too there is a chrome-colored spacer. The second set of arms is identical in appearance to the first except that the second is longer and the curvilinear counterweight somewhat smaller. The arms themselves are also slightly thinner. In addition, at the longer end of the second set of arms is mounted a rhomboid-shaped lamp holder with a tail fin. Inside this holder is a halogen bulb and reflector. The top of this holder has two vertical rows of perforations for ventilation. The Tizio is entirely black in color except for the on/off switch and spacers as noted above.[2]

The Pargido lamp is, to the eye, strikingly similar to the Tizio. The principal distinguishing feature is that the Pargido has only one set of parallel arms and thus only one pivot point, which is at the top of the struts. The base of the Pargido is virtually identical to that of the Tizio, except that the on/off switch of the Pargido is placed horizontally, as viewed with the lamp directly facing the user, while the switch of the Tizio, when viewed from the same vantage point, is in a vertical position. The switches of the two lamps are both red in color,[3] although each has slightly different markings. In addition, the switch on the Pargido is a two-position switch, while the Tizio switch is capable of three positions. The base of the Pargido, like the Tizio, houses a transformer and is set on a rotating circular platform.

The struts which rise from the base are mounted in the same fashion and set apart by approximately the same distance as those on the Tizio. The arms of the Pargido are fastened to the struts by screws, which, unlike those on the Tizio, have round, knob-like heads that can be turned by the user to regulate movement of the arms. The arm set itself is identical in all significant respects to the second set of arms on the Tizio, including the shape and size of the counterweight and the thin metal spacer at the joint. An additional feature of the Pargido, necessitated by its one arm-set design, is the use of spherical spacers a quarter-inch or so in width, between each strut and the arm to which it is joined. The lamp holder of the Pargido, like the Tizio, has a rhomboid shape and tail fin. It is ventilated in a slightly different manner and is slightly larger than the holder on the Tizio. It also has a handle, which is not part of the Tizio design. The handle, however, does not significantly alter the appearance of the lamp holder. Inside the holder is a halogen bulb and reflector. The holder itself is mounted to the arms by the use of two hexagonal acorn nuts, which do not appear on the Tizio.

The Tizio lamp is sold throughout the world, and since 1972 in the United States. It is the subject of a United States utility patent, which, for purposes relevant here, protects against the use of two sets of parallel articulating arms. In approximately 1985, Grandlite began manufacturing a two arm-set copy of the Tizio. *See* Ex. 14. Plaintiffs instituted an action for patent infringement in February 1986, which resulted in a settlement under which Grandlite agreed not to manufacture or sell the two arm-set copy. *See* Ex. 13. At that time, Grandlite was selling the product to Grandrich and informed Grandrich that it would no longer be able to supply the lamp. *See* Tr. at 371, 387. Then, in August or September 1986, Grandlite approached Grandrich with the Pargido. Grandrich shortly thereafter began advertising the Pargido for sale. Plaintiffs became aware of the ads in October 1986 and warned

---

**2.** The lamp is also manufactured in white.

**3.** There are actually two versions of the Pargido, *compare* Ex. 10 *with* Ex. 11. The only difference between them is that one has a red on/off switch while the switch on the other is black.

Grandrich that they would initiate legal action if they found the Pargido on the market. *See* Ex. 12.

On April 27, 1987, Philip Kanner, Assistant Marketing Director of Artemide, Inc., was informed by the national sales manager that the Pargido lamp was being sold at Jensen–Lewis. Kanner went to Jensen–Lewis and inquired about the lamp. He was told by the salesperson that Basic Concepts was the distributor. The lamp on display included a sticker with the name "Pargido." The price was $98.95, marked down from $120.00. The salesperson told Kanner that there was only one lamp in stock.

On April 29, Kanner returned to the store, which had just received a shipment of 14 Pargidos. Kanner purchased one lamp that day, *see* Ex. 11, and two more a few days later. On the day of the second purchases, the salesperson initially identified the Pargido to Kanner as a Tizio but later said that it was a copy of the Tizio.

On May 5, Kanner went into Laytners, where the lamp was also on display. The salesperson told him that the lamp was a copy of the Tizio. It was priced at $130.00 and had no Pargido label. The salesperson identified Basic Concepts as the distributor. Kanner purchased the lamp. *See* Ex. 10.

On May 13, 1987, plaintiffs brought on the instant motion by order to show cause seeking a preliminary injunction against sale of the Pargido by any of the defendants. Plaintiffs make no claim for patent infringement and indeed seem to concede that the Pargido does not infringe the Tizio patent. Instead, they rely solely on theories of trade dress protection. The Court granted a temporary restraining order against Laytners and Jensen–Lewis. Basic Concepts agreed not to take any action pending the outcome of the motion. The restraining order was later extended to Grandrich.

A hearing was held on May 18, 20, 26 and 27. Neither Grandlite, a Taiwanese corporation, nor Jensen–Lewis appeared to oppose. Basic Concepts and Laytners put in a defense to the motion. Grandrich, a California corporation, in addition to defending on the merits, moved to dismiss for lack of personal jurisdiction and improper venue or alternatively for transfer. It also moved to dismiss the complaint for failure to state a claim for which relief may be granted. The briefs of the parties were fully submitted on June 9, 1987.

For reasons that follow, plaintiffs' motion for a preliminary injunction is granted in part and denied in part. The Court also denies Grandrich's motion to dismiss for lack of jurisdiction but grants the motion to dismiss for improper venue. The Court does not reach Grandrich's other motions.

## DISCUSSION

### I. *Personal Jurisdiction and Venue*

As Grandrich has moved to dismiss for lack of personal jurisdiction and improper venue, the Court discusses these issues at the outset.

Grandrich, as noted, is a California corporation, founded in 1985 by Richard Yu. It is qualified to do business in New Jersey and has operated a branch office and warehouse there since January 1987. The New Jersey office is run by Richard Liu, a vice-president of Grandrich. Grandrich has no offices, telephone listing, warehouses, or employees in New York. It does maintain a New York bank account. It has no bank account in New Jersey.

Grandrich has four sales representatives in New York, all of whom are independent contractors, serving other distributors as well. Tr. at 376. The representatives solicit sales for defendant, but cannot confirm orders. They also assist Grandrich in collecting disputed amounts from customers, but only after Grandrich has determined the merits of the claim. *See, e.g.,* Ex. 2 to Liu Deposition at 3, ¶ 6. Of the four representatives, one has produced no orders for Grandrich and another has produced only two. The other two representatives are responsible for the sale of 15,000 lamps in New York. Grandrich has sold an additional 5,000 lamps in New York as a result of customer referrals and promotions at various trade shows held outside of New York. In all, since January 1987 Grandrich has

sold 20,000 lamps in New York valued at $100,000, an amount which Grandrich claims accounts for only two percent of its national sales. Grandrich has also sent 100 catalogues to its representatives for distribution to customers, and mails catalogues directly to customers who make telephone orders to Grandrich. In addition, Grandrich advertises in Home Magazine, a publication with national circulation, including New York.

Liu has traveled to New York on two occasions since January 1987, each time to assist a sales representative in a meeting with a customer. Liu also attended a trade show in New York City for three days. At the show, Grandrich displayed 40 or 50 lamps and received four orders, totaling $6,000, all shipped to locations outside New York.

Finally, there is evidence that on one occasion an employee of Grandrich, New Jersey, told plaintiffs' investigator, who was posing as a New York customer with an inquiry about Grandrich products, that she would send him sales literature and have a salesman visit his place of business. Tr. at 12. On another occasion, Mr. Liu, when speaking with one of plaintiffs' employees, who was also posing as a New York customer with a similar inquiry, offered to set up a meeting to discuss Grandrich's products. Tr. at 201.

With this background, the Court turns to the question of jurisdiction. Plaintiffs, of course, bear the burden of proof on this issue, *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir.1985), and must, at the preliminary injunction stage, establish "a reasonable probability of ultimate success" on the merits. *Visual Sciences, Inc. v. Integrated Communications, Inc.*, 660 F.2d 56, 59 (2d Cir.1981) (quoting *Industrial Electronics Corp. v. Cline*, 330 F.2d 480, 482 (3d Cir.1964)). The governing law is supplied by the state in which the Court sits. *See Honda Associates, Inc. v. Nozawa Trading, Inc.*, 374 F.Supp. 886, 888 (S.D.N.Y.1974). In this case, plaintiffs allege jurisdiction under N.Y. CPLR §§ 301 and 302(a)(2).

Section 301 subjects a foreign corporation to jurisdiction of the New York courts with respect to any cause of action if that corporation is "engaged in such a continuous and systematic course of 'doing business' in New York that it may be said to be present here." *McGowan v. Smith*, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321, 323 (1981). The foreign corporation must be doing business "not occasionally or casually but with a fair measure of permanence and continuity." *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267, 115 N.E. 915 (1917). Mere solicitation of business in New York will not alone sustain a finding that a foreign corporation is "doing business," *Miller v. Surf Properties, Inc.*, 4 N.Y.2d 475, 176 N.Y.S. 2d 318, 151 N.E.2d 874 (1958); *compare Laufer v. Ostrow*, 55 N.Y.2d 305, 449 N.Y. S.2d 456, 434 N.E.2d 692 (1982) (mere solicitation by corporation's employees will suffice if sole function of corporation is soliciting sales); but substantial solicitation plus "very little more" is all that is required. *Aquascutum of London, Inc. v. S.S. American Champion*, 426 F.2d 205, 211 (2d Cir.1970).

The "solicitation plus" rule, as it is called, is satisfied when, in addition to solicitation, the foreign corporation is involved in some financial or commercial dealings in New York or holds itself out as operating in New York. *See Aquascutum*, 426 F.2d at 212. The cases tend to focus on a physical corporate presence. Thus, it has been held that maintenance of a small office and a few employees in New York will satisfy the test, even if the business conducted out of that office is relatively minor or involves mere solicitation. *See, e.g., Bryant v. Finnish Nat'l Airline*, 15 N.Y.2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 439 (1965); *Tauza*, 220 N.Y. 259, 115 N.E. 915; *see also Manchester Modes, Inc. v. Lilli Ann Corp.*, 306 F.Supp. 622 (S.D.N.Y.1969). On the other hand, it is not enough that an independent contractor is present in New York, systematically soliciting business for the corporation, *see Miller v. Surf Properties, Inc.*, 4 N.Y.2d 475, 176 N.Y.S.2d 318, 151 N.E.2d 874 (1958), no matter how substantial the resulting orders, *Laufer*, 449

N.Y.S.2d at 459, 434 N.E.2d at 694; *Delagi v. Volkswagenwerk AG*, 29 N.Y.2d 426, 433, 328 N.Y.S.2d 653, 657, 278 N.E.2d 895, 898 (1972).

An independent contractor may become an agent of the foreign corporation, however, in which event "doing business" may be found. In *Katz Communications, Inc. v. Evening News Ass'n*, 705 F.2d 20 (2d Cir.1983), for example, it was held that the independent contractor was made virtually a division of defendants' business. *Id.* at 24. In addition to solicitation, the independent contractor assisted in the planning of defendants' national advertising program, guaranteed advertisers' orders, billed the advertisers, and collected from them. Defendants themselves, through their employees, made periodic visits to the jurisdiction to participate in planning and executing the tactics and strategy for getting advertising contracts. On these facts defendants were deemed present. *See also Caballero Spanish Media, Inc. v. Betacom, Inc.*, 592 F.Supp. 1093 (S.D.N.Y.1984).

Similarly, in *Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116 (2d Cir.1967), the Court found that the independent contractor both booked and *confirmed* reservations for defendant's bus tours and performed other services that were integral to defendant's business. *Id.* at 121; *see also Frummer v. Hilton Hotels Int'l Inc.*, 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851, *cert. denied*, 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967) (services performed by affiliate of defendant Hotel, including publicity work and making final room reservations, plus the fact that affiliate was run for the benefit of defendant, sufficient to confer jurisdiction); *compare Miller, supra* (foreign corporation was not "doing business" when independent agency solicited but could not confirm reservations on its behalf).

It has been said that the cases "require 'substantial solicitation' that is carried on with a 'considerable measure of continuity and from a permanent locale' within the state," *Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757, 763 (2d Cir.1983) (citations omitted); and, as Judge Friendly observed, "where the activities in addition to solicitation have been particularly skimpy, the courts upholding personal jurisdiction have considered it worthy of comment that the defendant was represented in New York by its own employees rather than by an independent contractor." *Aquascutum*, 426 F.2d at 212; *see Ring Sales Co. v. Wakefield Engineering*, 90 A.D.2d 496, 454 N.Y.S.2d 745, 746 (2d Dep't 1982).

In the instant case, plaintiffs' proof has fallen short of the mark. Although there is ample evidence of solicitation, albeit only arguably substantial solicitation, *see Dunn v. Southern Charters, Inc.*, 506 F.Supp. 564, 567 (E.D.N.Y.1981) (expressing doubt that 1½% of total income is "substantial," and citing examples), the requisite "plus" factors have not been shown. It is undisputed that the New York sales representatives are wholly independent of defendant, service distributors other than defendant, and have no power to bind defendant. To the extent they are authorized to collect disputed accounts, defendant must first determine the legitimacy of the customer complaint. There is no evidence that Grandrich exercises any degree of control over the representatives, and thus no evidence of agency. In short, there is no basis to attribute the New York presence of the sales representatives to Grandrich. *See Cohen v. Vaughan Bassett Furniture Co.*, 495 F.Supp. 849, 851 (S.D.N.Y.1980).

Nor is there evidence of any regular or qualitatively significant commercial dealings, apart from solicitation, which Grandrich conducts in New York. *See, e.g., Ally & Gargano, Inc. v. Comprehensive Accounting*, 603 F.Supp. 923, 924–25 (S.D.N.Y.1985) (defendant's New York activities included servicing franchises, conducting seminars, attending trade shows, and participating in the creation of advertising). In this respect, Grandrich's participation in one New York trade show for only three days is hardly sufficient, especially when the location of a trade show is generally fortuitous.

That Grandrich also advertises in a magazine of national circulation and sends sales catalogues to its New York sales represent-

atives and occasionally directly to customers does not help plaintiffs. These activities amount to no more than solicitation as do Liu's visits to New York, which are, in addition, too occasional to establish a New York presence of the corporation. *See Pneuma–Flo Systems v. Universal Machinery,* 454 F.Supp. 858, 865 (S.D.N.Y. 1978). The only remaining New York contact is the bank account. However, no evidence of its significance has been presented, despite plaintiffs' opportunity to probe this area, *see generally* Liu Deposition, and the Court therefore finds this contact insufficient.

■ Based upon the foregoing, the Court concludes that Grandrich is not "doing business" in New York and is accordingly not subject to jurisdiction pursuant to N.Y. CPLR § 301. *See generally Ring Sales Co. v. Wakefield Engineering,* 90 A.D.2d 496, 454 N.Y.S.2d 745 (1982). The Court, however, thinks it clear that Grandrich is subject to jurisdiction pursuant to section 302(a)(2), which provides for personal jurisdiction over one who commits a tortious act within the state. Grandrich admits to shipping 17 Pargido lamps into New York.[4] It is settled law in this Circuit that the offering for sale of infringing goods in the jurisdiction satisfies this provision of the CPLR. *See Oral–B Laboratories, Inc. v. Mi–Lor Corp.,* 611 F.Supp. 460, 461 (S.D.N.Y.1985), *modified on other grounds,* 810 F.2d 20 (2d Cir.1987); *German Educ. Tel. v. Oregon Public Broadcasting,* 569 F.Supp. 1529, 1532 (S.D.N.Y. 1983); *Beecham, Inc. v. Certified Chemicals, Inc.,* 472 F.Supp. 348, 349 (S.D.N.Y. 1979); *Honda Assocs. Inc. v. Nozawa Trading, Inc.,* 374 F.Supp. 886, 888 (S.D.N.Y.1974). The only remaining question is whether venue is proper here.

■ 28 U.S.C. § 1391(b) provides for venue in the district in which all of the defendants reside or the claim arose. Because the Court has already concluded that

defendant is not doing business in New York, defendant cannot be said to reside in the district. *See Honda,* 374 F.Supp. at 889–90. The Court must therefore determine where the claim arose.

The threshold inquiry in this respect is whether any substantial part of the infringing activity occurred in New York. If it did not, venue is improper. *See Greene v. Sha–Na–Na,* 637 F.Supp. 591, 600 (D.Conn.1986); *Metropa Co. v. Choi,* 458 F.Supp. 1052, 1055 n. 14 (S.D.N.Y.1978) (Weinfeld, J.); *Honda,* 374 F.Supp. 886, 892 (S.D.N.Y.1974); *see also Tefal v. Products Intern. Co.,* 529 F.2d 495, 496–97 (3d Cir. 1976); *Factors Etc. v. Creative Card Co.,* 444 F.Supp. 279, 287 (S.D.N.Y.1977).

According to Richard Yu, president of Grandrich, defendant has sold 1,000 Pargido lamps in the United States, Tr. at 408, with 50% of these sales occurring in California, *see* Declaration of Richard Yu ¶ 5, Ex. 1 to Notice of Motion to Dismiss, 87 Civ. 3178 (JMC) (filed S.D.N.Y. May 27, 1987). Only 1.7% of Pargido sales were made in New York, and these resulted from only two customer orders.[5] In light of the scope of plaintiffs' complaint, which is based on sales of the Pargido lamp throughout the country, and the relief sought, which includes an injunction and damages coextensive with those sales, the New York component forms "no substantial part" of the overall infringing activity. *See Johnson Creative Arts v. Wool Masters,* 743 F.2d 947, 955 (1st Cir.1984). Moreover, as the Supreme Court has said in *Leroy v. Great Western United Corp.,* 443 U.S. 173, 185, 99 S.Ct. 2710, 2717, 61 L.Ed.2d 464 (1979):

> [I]t is absolutely clear that Congress did not intend to provide for venue at the residence of the plaintiff or to give that party an unfettered choice among a host of different districts.... In our view, therefore, the broadest interpretation of

---

4. The Court finds no merit in defendant's argument that it is an innocent user, but need not discuss the issue in light of the venue ruling below.

5. Some of the catalogues sent to the New York sales representatives included a picture of the Pargido. The exact number of these catalogues has not been established but it can be no more than 100—the total number of catalogues distributed.

the language of 1391(b) that is even arguably acceptable is that in the unusual case in which it is not clear that the claim arose in only one specific district, a plaintiff may choose between two (or conceivably even more) districts that with approximately equal plausibility in terms of the availability of witnesses, the accessibility of other relevant evidence, and the convenience of the defendant (but *not* of the plaintiff) may be assigned as the locus of the claim.

Virtually all of the relevant decisions and actions on the part of Grandrich took place in California. *See Johnson Creative Arts,* 745 F.2d at 956. Many of the retailers of the Grandrich lamps obviously reside there as do the ultimate purchasers. The fact that Grandrich also has certain contacts with New York does not weigh in plaintiffs' favor as these contacts are largely unrelated to sale of the Pargido. Nor is David Liu's presence in New Jersey a reason to place venue in the Southern District of New York, when he has apparently had little involvement with the Pargido.

For these reasons, the Court finds that this district may not be assigned as the locus of the claim. Defendant's motion to dismiss for improper venue is granted. The Court need not consider defendant's other motions.

## II. *The Merits*

Turning now to the merits of plaintiffs' claims with respect to the remaining defendants, the standards for granting a preliminary injunction are well established. Plaintiffs must make a showing that they will be irreparably harmed without the interim relief, and show either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in their favor. *Stormy Clime Ltd. v. Pro-Group, Inc.,* 809 F.2d 971, 973 (2d Cir. 1987); *LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 74 (2d Cir.1985).

■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), establishes a federal law of unfair competition prohibiting the marketing of a product which conveys a false designation of origin. *Stormy Clime,* 809 F.2d at 974; *LeSportsac,* 754 F.2d at 75. Under this section, the first manufacturer of a product is entitled to an unregistered trademark in the "trade dress" of the product. *Stormy Clime,* 809 F.2d at 974. The trade dress of a product "involves the total image of a product and may include features such as size, shape, color or color combinations, texture, [or] graphics." *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 980 (11th Cir.1983), *quoted in Stormy Clime,* 809 F.2d at 974 *and LeSportsac,* 754 F.2d at 75. Traditionally, trade dress infringement actions have involved the packaging or labeling of goods. *Stormy Clime,* 809 F.2d at 974; *LeSportsac,* 754 F.2d at 75. It is now settled in this Circuit, however, that the design of a product may function as its packaging, thus becoming eligible for trade dress protection under the Lanham Act. *Stormy Clime,* 809 F.2d at 974; *LeSportsac,* 754 F.2d at 75; *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 78 (2d Cir. 1981).

■ To establish a claim for trade dress infringement in the design of a product, the party seeking protection must demonstrate that the design of its product has acquired secondary meaning in the marketplace by which it is identified with its producer or source, *see LeSportsac,* 754 F.2d at 75, and that the design of the competitor's product is likely to confuse consumers as to the product's source, *id.* Even when both of these elements are present, the competitor will prevail if the similar arrangement of features is functional. *Stormy Clime,* 809 F.2d at 974. In this respect, the burden of proof is on the competitor. *LeSportsac,* 754 F.2d at 75–76.

### Functionality

The functionality defense protects "advances in functional design from being monopolized [in order to] encourage competition and the broader dissemination of useful design features." *Warner Bros., Inc. v. Gay Toys, Inc.,* 724 F.2d 327, 330 (2d Cir.1983). Of primary concern is that the

law of trade dress not disturb the careful balance struck in the patent laws between society's desire to encourage new ideas and its desire to promote competition. *See Stormy Clime*, 809 F.2d at 978. It is not the role of trade dress law to withhold from the public domain those useful articles which the patent laws hold unprotected. *Id.*

The Second Circuit has most recently examined the functionality defense in *Stormy Clime* and *LeSportsac.* As these cases instruct, the starting point in analysis is to determine whether the various features of the design are functional. In this respect, a feature is functional if it "is essential to the use or purpose of the article or affects the cost or quality of the article." *Inwood Laboratories v. Ives Laboratories, Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982), *quoted in LeSportsac*, 754 F.2d at 76. A design feature is "essential" only if it is dictated by the functions to be performed. It is not enough that the feature merely accommodates a useful function. A feature "affect[s] the cost or quality of an article" when it permits the article to be manufactured at a lower cost or constitutes an improvement in the operation of the goods. *See LeSportsac*, 754 F.2d at 76.

The Court must assess the degree of functionality of the similar features as well as the degree of similarity between the nonfunctional features of the competing product. Also relevant is the feasibility of alternative arrangements of functional features that would not impair the utility of the product. *Stormy Clime*, 809 F.2d at 977. These factors are to be considered along a continuum.

On one end, unique arrangements of purely functional features constitute a functional design. On the other end, distinctive and arbitrary arrangements of predominantly ornamental features that do not hinder potential competitors from entering the same market with differently dressed versions of the product are non-functional and hence eligible for trade dress protection. In between, the case for protection weakens the more clearly the arrangement of allegedly distinctive features serves the purpose of the product (including maintenance of low cost), especially where the competitor copying such features has taken some significant steps to differentiate its product.

*Id.*

The fact patterns of *LeSportsac* and *Stormy Clime* approximate the two extremes discussed above. In *LeSportsac*, plaintiff was the seller of a distinctive line of lightweight luggage. The luggage was made from parachute nylon, trimmed with color-coordinated cotton-webbing straps and color-coordinated zippers with hollow rectangular pulls, and marked by repetitive printing of the LeSportsac logo on the cotton tape. Defendant began selling a competing line of luggage that resembled plaintiff's bag in substantially every respect. The Court held that the individual features as well as their overall arrangement were nonfunctional as that term is defined. The Court observed that there were numerous other ways to make lightweight nylon bags with hollow zipper pulls and carpet-tape trim. *See LeSportsac*, 754 F.2d at 76–77.

In *Stormy Clime* by contrast, the article at issue was a golf jacket. The Court noted that the features similar to both plaintiff's and defendant's jackets—shingles/vents, high sheen waterproof fabric, and hood—were dictated by the purpose of providing "a low-cost, unemcumbering, waterproof jacket for wear while playing golf." 809 F.2d at 976. The purely ornamental features and labelling were different in almost every respect. The Court held the design to be functional and thus not protectable. *Id.*

In the instant case, defendants urge that the design of the Tizio is an arrangement of purely functional features and is thus a functional design. Plaintiffs respond that many of the Tizio components can be made in numerous other shapes, without destroying the utility of the lamp. Specifically, plaintiffs contend that the (1) shape of the base, (2) shape and location of the vents, (3) position, shape and color of the switch, (4) shape of the counterweights, (5) shape and

color of the insulators, (6) location and color of the chrome spacers, and (7) shape of the lamp head could all be changed. Plaintiffs point to Exhibits 26–30 as examples.

A review of the evidence reveals that many of the features employed in the Tizio design are functional. Thus, the cylindrical base allows the lamp to rotate on a desk without disturbing other articles on the desk. Tr. at 280. The size of the base minimizes the amount of table space occupied by the lamp. Tr. at 312. The vents at the bottom of the base permit air to enter and cool the transformer housed in the base. The hot air then leaves the base through the ventilators at the top. Tr. at 284–85. The design of the vents does not appear to be unusual and there is no persuasive evidence that numerous alternatives are available. Indeed, plaintiffs' expert testified to only one. Tr. at 273.

The on/off switch was characterized by plaintiffs' expert as an "off the shelf" switch used by a number of manufacturers. Tr. at 274. Although available in different shapes, the rectangular design appears rather common, and in any event, as previously noted, the switch of the Tizio is not identical to that of the Pargido. Plaintiffs' expert acknowledged that the switch should be near the transformer, Tr. at 273, and the location of the switch, at the front top side of the base, appears to be the most logical choice.

The struts support the body of the lamp, Tr. at 137, and conduct electricity, without the need for wires, from the transformer in the base to the arms, Tr. 137–38. The arms likewise conduct electricity to the lamp. *Id.* The flat shape of the struts and arms is an economical choice. Tr. at 305–06. The counterweights serve to balance the arms. Tr. at 137–38, 275. The tension system enables the arms to move without the use of springs. Tr. at 132–33.

Each of these features is dictated by the particular function to be performed, and the combination of these features is necessary if the lamp is to utilize all of the various functions. The present case then closely resembles *Stormy Clime,* in which the individual features and their particular combination were dictated in large measure by function. Accordingly, the Tizio features noted above as well as their arrangement may be freely copied.

The analysis can not end here, however, because other features of the lamp are plainly nonfunctional. Starting with the counterweights, there is no functional reason why they are shaped in a curvilinear fashion. The only functional quality of this feature is the weight provided. Tr. at 275. Nor is it necessary that the spacers be chrome-colored, or that the insulators be red. *See* Ex. 26. Finally, assuming that the shape of the reflector is functional, Tr. at 316, neither the rhomboid shape of the lamp holder, nor the tail fin is dictated by the shape of the reflector. This point is vividly demonstrated by the lamp head of the Pargido, which is larger than necessary to house the reflector. *See, e.g., In re Morton–Norwich Prods.,* 671 F.2d 1332, 1342 (Cust. & Pat.App.1982) (shape of container for spray products not functional).

Having determined that these features are nonfunctional, or at a minimum that sufficiently serious questions exist on this issue, copying of these features may be prohibited, even though much of the lamp's design is functional, if there is proof of secondary meaning and likelihood of confusion, and plaintiffs can establish that these features contribute to the buyer's perception of the lamp as a source designator. *See John H. Harland,* 711 F.2d at 984; *see also Stormy Clime,* 809 F.2d at 976 (noting that the purely ornamental features of the jackets at issue were not copied); *cf. Textron v. ITC,* 753 F.2d 1019, 1026–27 (Fed.Cir.1985) (design trademark case). This approach strikes an appropriate balance between the goal of the functionality defense on the one hand, which is to encourage competition and the broadest dissemination of useful design features, and the Lanham Act's purpose on the other, which is to prevent confusion as to source. *See Stormy Clime,* 809 F.2d at 976. By permitting competitors to copy functional features and combinations, while restricting their copying of the ornamental ones, both of these aims are achieved.

■ Defendants argue that, to the extent the Tizio design serves no utilitarian function, it is aesthetically functional. In this Circuit the concept of aesthetic functionality is limited to determining whether consumers are likely to purchase a Tizio lamp rather than that of a competitor principally because they find the Tizio's particular combination of features aesthetically pleasing, in which event the design is functional, or will buy the lamp principally because the features serve to identify or distinguish it as a genuine Tizio by Artemide. *See LeSportsac*, 754 F.2d at 78.

Whether the arrangement of features identifies the particular article as genuine is an issue which overlaps, at least to some degree if not substantially, with the secondary meaning inquiry. As will be discussed below, the Court finds there to be sufficiently serious questions of secondary meaning to make that issue a fair ground for litigation. Defendants, who have the burden of proving functionality, have simply not established why consumers purchase the Tizio. Accordingly, at this juncture, there is no basis from which the Court might fairly conclude that the Tizio is aesthetically functional.

*Secondary Meaning*

■ The trade dress of a product has achieved secondary meaning when the buying public "associates that dress with a single producer or source rather than just with the product itself." *LeSportsac*, 754 F.2d at 78. The design must be "so distinctively associated with the plaintiff that it operates much in the manner of a trademark." *Vibrant Sales, Inc. v. New Body Boutique*, 652 F.2d 299 (2d Cir.1981) (quoting *L & L White Metal Casting Corp. v. Joseph*, 387 F.Supp. 1349, 1356 (E.D.N.Y. 1975)), *cert. denied*, 455 U.S. 909, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982). In order to establish sufficiently serious questions of secondary meaning, it is enough that plaintiffs offer proof of such things as (1) substantial advertising expenditures, (2) great sales success, (3) unsolicited media coverage, and (4) defendants' deliberate attempt to imitate its product. There is no requirement that survey evidence be presented at the preliminary injunction stage. *See LeSportsac*, 754 F.2d at 78.

■ The Court is satisfied that plaintiffs have met their burden. The Tizio lamp is sold throughout the world and has been sold in the United States since 1972. Tr. at 67. The Tizio is retailed at approximately 400 stores in this country, 40 of which are select retailers. *See* Tr. at 48. The lamp retails for between $240 and $350. *See* Tr. at 60. Last year, total worldwide sales amounted to 100,000 units. *See* Tr. at 59. Of these, 15,000 were sold in the United States. *See* Tr. at 60. For 1987, Guido Buratto, executive vice-president of Artemide Inc., projects that 20,000 units will be sold here. Tr. at 60. Since 1972, 100,000 units have been sold in the United States, having a wholesale value of $30 million. *See* Tr. at 60. Buratto estimates that sales of the Tizio lamp account for 40% of Artemide Inc.'s total sales. *See* Tr. at 61.

The Tizio lamp is included in the permanent collection of designs at the Museum of Modern Art. *See* Tr. at 62. The Metropolitan Museum has recently asked that the lamp become part of its collection. *See* Tr. at 62. The Museum of Modern Art carries the Tizio in the Museum store, and has done so, according to Buratto, for the past 10 years. *See* Tr. at 63. The Museum sales' catalogue includes an advertisement of the Tizio, in which the Artemide name is also featured. *See* Ex. 3.

Artemide Inc. advertises the Tizio in such magazines as California Magazine, The New Yorker, Home Lighting and Accessories, Texas Home Magazine, L.A. Style, House and Garden, and Metropolitan Home, among others. *See* Ex. 4. In each ad, the name Artemide is prominently displayed. The lamp is also advertised in foreign publications under the Artemide name, *see* Ex. 5, appears in Artemide catalogues, *see* Ex. 6, and is exhibited at various trade shows, *see* Tr. 68–69, where, according to Buratto, it is prominently displayed as the "symbol of Artemide." Tr. at 68–69. Each year plaintiffs also distribute, presumably to retailers, 100,000 white shopping bags with the name "Artemide"

displayed in large bold lettering across the top and the name "Tizio" in somewhat smaller but equally black and bold lettering near the center. Across the surface of the bag is a picture of the lamp, depicted in motion. *See* Ex. 7; Tr. at 68. In all, Artemide Inc. spends approximately $300,-000 per year to advertise the Tizio. *See* Tr. at 68.

Various retailers also advertise the Tizio in such papers as The New York Times, Newsday, and the Wall Street Journal. *See* Ex. 9. Some of the ads feature the name Artemide, while others do not. *See id.* One of Artemide's select dealers, The Lighting Center Ltd., produces a business card on which a silhouette of the Tizio appears in the background. *See* Ex. 16; Tr. at 176–77.

The Tizio has also been the subject of several commentaries, which have appeared in various magazines. *See* Ex. 8. Many of these note the lamp's unique and artistic design, flexibility, and wireless engineering. Some also refer to the lamp as a status symbol among the so-called "yuppie" class. Virtually all of the articles discuss Artemide as the maker of the lamp, and a few of the articles focus entirely on Artemide.

The above evidence establishes serious questions going to the merits on the issue of secondary meaning. *See LeSportsac,* 754 F.2d at 78–79. As discussed previously, however, plaintiffs must also establish that the nonfunctional features contribute to the buyer's perception of the lamp as a source designator. Although no direct proof has been offered on this issue, the Court believes it sufficient at this stage that these features are distinctive, and serve to distinguish the lamp from other similar products. *Compare* Ex. 26. In addition, as will be discussed more fully below, it is readily apparent that the Pargido was intended to resemble the Tizio in all material respects, save those that might infringe the Tizio patent. Copying of nonfunctional features is evidence of secondary meaning, 754 F.2d at 78, although perhaps not as strong as in the trademark context, in which there can be little other

explanation for copying except the competitor's desire to trade on plaintiff's good will. *See 20th Century Wear, Inc. v. Sanmark–Stardust Inc.,* 815 F.2d 8, 10 (2d Cir.1987). In the case of a product design, of course, copying might be explained by the popularity of the product alone, notwithstanding its source.

*Confusion*

In *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), Judge Friendly enunciated eight factors to be considered in determining whether "there is a likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 256 (2d Cir.1987) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)). Although created as a guide in trademark cases, these factors are adaptable to trade dress suits. The factors are: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the competitive proximity of the products or services; (4) the existence of actual confusion; (5) the likelihood that the plaintiff will "bridge the gap" between the two markets; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of purchasers. *Polaroid,* 287 F.2d at 495.

Applying these factors here, the Court believes that plaintiffs have adduced sufficient evidence of a likelihood of confusion to support the issuance of a preliminary injunction. Although the strength of plaintiffs' mark can not as yet be ascertained, there are, as previously indicated, sufficiently serious questions going to the merits on the issue of secondary meaning. It is also clear that defendants' design closely parallels the Tizio. Considering the nonfunctional features in particular, the lamp holders are both rhomboid-shaped with a tail fin. The Pargido lamp holder is

slightly larger, and includes a handle, but these details are relatively minor and do not serve to distinguish the two lamps. The curvilinear counterweights are for all practical purposes identical, as are the pin-like spacers at the joints and the color of the insulators. When these primarily ornamental features are used in conjunction with the functional aspects of the design, the only significant difference between the two lamps is that the Pargido has only one set of arms. It is more than conceivable that the ordinary purchaser might reasonably believe the Pargido to be a smaller version of the Tizio. Indeed, salespeople at both Laytners and Jensen–Lewis described the Pargido as a copy of the Tizio. Tr. at 198, 199. Moreover, there is evidence that both lamps are sold at a number of the same locations, including Lighting By Gregory, Tech Lighting, Creative Lighting, Tr. at 263–64, and Lamps Plus, Tr. at 491–95.

Perhaps most compelling on the issue of likelihood of confusion is the evidence that the Tizio design was intentionally copied. *See Mobil Oil Corp.*, 818 F.2d at 258; *LeSportsac*, 754 F.2d at 79; *Perfect Fit Indus. v. ACME Quilting Co.*, 618 F.2d 950, 954 (2d Cir.1980), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982). As discussed at the outset, prior to a lawsuit commenced by plaintiffs in early 1986, Grandlite was manufacturing a two-arm copy of the Tizio. *See* Ex. 14. Shortly after the suit was settled, Grandlite began manufacturing the Pargido. In August or September 1986, Grandlite sent Richard Yu, president of Grandrich, an advertisement of the Pargido and asked Yu to inquire of his attorney whether sale of the Pargido would infringe the Tizio patent. Tr. at 371–72. Yu requested a sample of the lamp which he received and showed to his attorney. The attorney advised that the lamp did not literally infringe the Tizio patent but suggested that the lamp be labelled to avoid consumer confusion with the Tizio. *Id.* at 372; Ex. 12 (letter of June 20). The attorney also contacted plaintiffs, who advised Grandrich not to distribute the lamp. Ex. 12.

Thus, apart from the physical similarities between the two lamps, which in this case, standing alone, represents substantial evidence of intentional copying, there is a history of intentional copying. In addition, there is evidence that Basic Concepts was involved in the distribution of the two-arm copy of the Tizio, prior to plaintiffs' first lawsuit against Grandlite, *see* Tr. at 178–79, 194, as well as evidence that Basic Concepts was aware of the above mentioned correspondence between counsel for Grandrich and plaintiffs concerning the Pargido.[6] Tr. at 258. It is by now axiomatic that intentional copying gives rise to a presumption of a likelihood of confusion. *See Mobil Oil Corp.*, 818 F.2d at 258; *Perfect Fit*, 618 F.2d at 954.

Defendants vigorously argue that there can be no confusion in this case because their product clearly displays the Pargido name on the box in which the lamp is sold and on a "sticker" affixed to the base of the lamp. It is well settled that labelling of a product can eliminate any significant likelihood of confusion. *See Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1446 (Fed.Cir.1984); *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 194–95 (1st Cir.1980); *Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304, 310 (2d Cir.1972); *Sunbeam Corp. v. Equity Indus.*, 635 F.Supp. 625, 633 (E.D.Va. 1986). The Court must look at both the prominence of the label and the type of product. *See Litton*, 728 F.2d at 1446. Thus, the labelling on a relatively inexpensive product may do little to avoid confusion because the average buyer of such items may give little thought to the purchase. The more expensive the item, however, the more likely it is that the buyer will make a careful inspection and necessary inquiry before executing the purchase.

In the present case, the price range of the lamps at issue makes it fair to assume that the prospective buyer will not take his purchasing decision lightly. *See, e.g., Litton*, 728 F.2d 1423 (microwave oven); *Bose*,

6. The Court accordingly rejects Basic Concepts' innocent user defense.

467 F.2d 304 (stereo speaker system); *Sunbeam*, 635 F.Supp. 625 (food processor); *Black & Decker, Inc. v. North American Philips Corp.*, 632 F.Supp. 185 (D.Conn. 1986) (vacuum cleaner). In addition, there is evidence that the Tizio consumer is somewhat sophisticated. Tr. at 61, 177. The Court therefore evaluates the adequacy of the labelling.

Considering first the "sticker," the evidence is clear that this label does not appear on all Pargidos sold. Tr. at 328–29; *compare* Exs. 10 *and* 11. Moreover, even if there were no evidence of Pargidos sold *sans* label, the type of label involved here, which is easily removable, would not suffice. *See LeSportsac*, 754 F.2d at 80. Accordingly, the Court turns to the labelling on the box.

At the outset the Court notes that there is persuasive evidence that these lamps are generally displayed in stores without their box. Although there is also some evidence of stores in which the box is exhibited alongside the lamp, the Court finds that the far more common practice is to display the lamp alone. Thus, for much of the inspection period a consumer does not have benefit of the box. Nonetheless, the evidence is undisputed that at the point of sale the customer always receives the Pargido in a box which bears the Pargido name. *See* Ex. D. That box may be described as follows: On two sides, in large yellow letters are the words "Low–Voltage." Underneath these words in bold black print are the words "Quartz Halogen Lamp." To the right is a picture of the Pargido, prominently displayed. Then toward the bottom, is a small white box with black border set against a green background. In the box PARGIDO appears in block white letters, outlined in black. The letters thus appear white on white. Based on these observations, the Court concludes that the labelling is inconspicuous at best and does little to reduce the likelihood of confusion.

*Irreparable Harm/Balance of Hardships*

█ As a general rule, a finding of irreparable harm almost inevitably follows a finding of likelihood of confusion. *See Church of Scientology Int'l v. The Elmira Mission*, 794 F.2d 38, 41 (2d Cir.1986); *LeSportsac*, 754 F.2d at 79. In addition, in the instant case, Mr. Buratto testified that sales of the Tizio account for 40% of plaintiffs' overall United States business; and there is evidence that the Pargido is inferior in quality to the Tizio, *see* Tr. at 82, 109, which is supported by examination of the two lamps.

The only evidence of defendants' hardship came from Jerome Pearlman, president of Basic Concepts. He testified that his company has only been selling the Pargido since January 1987, Tr. at 334, and currently has $59,000 in outstanding orders for the lamp, Tr. at 333. Although Pearlman also testified that an injunction would be devastating to the good will of his company, Tr. at 325, 339, the Court finds this testimony incredible, apart from being wholly conclusory.

Defendants also argue that plaintiffs have been aware since June 1986 that the Pargido has been on the market and yet have waited until now to bring suit. However, until October 1986, plaintiffs were engaged in correspondence with Grandrich about prospective Pargido sales. In October 1986, plaintiffs warned Grandrich not to distribute the lamp. Although there is evidence that Grandrich ignored the warning and immediately began distribution, there is no evidence of extensive distribution since that time. Indeed, as previously discussed, Grandrich had only sold 1,000 of these lamps as of the time this action was filed and Basic Concepts only began selling the lamp in January. Thus, it is not difficult to believe that actual sales did not come to plaintiffs' attention until recently. Moreover, while plaintiffs might have acted more quickly, there is evidence that in the past plaintiffs have acted promptly to protect against infringement. In sum, the Court does not believe that plaintiffs' delay is significant in this case.

Based upon the foregoing, plaintiffs have established the requisite elements entitling them to preliminary injunctive relief. Accordingly, Grandlite, Basic Concepts, Laytners and Jensen–Lewis, their officers, agents, servants, employees, successors,

assigns, and all persons in active concert or participation with them are preliminarily restrained and enjoined from manufacturing, distributing, selling, or offering for sale any lamp resembling the Pargido, which includes any or all of the following features:

(i) a rhomboid shaped lamp holder,

(ii) a curvilinear counterweight,

(iii) a chrome-colored spacer,

(iv) red insulators.

As a condition to entry of the injunction, plaintiffs shall post, within five days of this decision, a bond in the amount of $100,000.

## CONCLUSION

For all of the foregoing reasons, plaintiffs' motion for a preliminary injunction is granted in part and denied in part. Fed.R.Civ.P. 65(a). The injunction is issued on the condition that a bond be posted in the amount set forth herein. The Court need not consider plaintiffs' state law claims.[7] Defendant Grandrich's motion to dismiss for lack of personal jurisdiction is denied. Fed.R.Civ.P. 12(b)(2). Its motion to dismiss for improper venue is granted. Fed.R.Civ. P. 12(b)(3). The Court does not reach Grandrich's other motions. The temporary restraining order is vacated.

SO ORDERED.

---

**7.** Although the Court does not in any event believe that the state laws also relied on by plaintiffs afford them any greater protection, plaintiffs have devoted little discussion to these issues.