**PAF S.r.l., an Italian corporation, and Koch + Lowy, a New York corporation, Plaintiffs,**

v.

**LISA LIGHTING CO., LTD., a New York corporation, Dac Wire Corp., a New York corporation, and Hunter–Melnor, Inc., a Delaware corporation, Defendants.**

No. 88 Civ. 6006 (BN).

United States District Court, S.D. New York.

May 2, 1989.

Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, N.J. (Lawrence I. Lerner, pro hac vice, and Charles P. Kennedy, of counsel), and Piliero & Goldstein, New York City (Robert D. Piliero, of counsel), for plaintiffs.

Temko & Temko, New York City (Charles E. Temko, of counsel), for defendants.

## OPINION AND ORDER

BERNARD NEWMAN, Senior Judge, United States Court of International Trade, sitting as a District Court Judge by designation:

## INTRODUCTION

This is an action for trade dress infringement and unfair competition. PAF S.r.l. ("PAF"), an Italian company, and Koch + Lowy ("K & L"), a New York corporation, plaintiffs herein, are respectively the manufacturer and exclusive United States distributor of the "DOVE" lamp. Defendant Hunter–Melnor, Inc., Kenroy International Division ("KI"), a Delaware corporation, imports the "SWAN" lamp from Taiwan and distributes it throughout the United States at wholesale in competition with plaintiffs' Dove lamp. Defendants Lisa Lighting Co.[1] and Dac Wire Corp., both New York corporations, are retail outlets that sell the Swan lamp.

Plaintiffs allege that the Swan is a "knockoff" of the Dove lamp. They assert claims under the Lanham Act § 43(a), 15 U.S.C. § 1125(a) (1982),[2] for false designation of origin and under N.Y.Gen.Bus.Law § 368–d (McKinney 1984) for dilution of a trademark. Complaint ¶¶ 22–23, 28, 29. In addition, plaintiffs plead a common law claim for unfair competition. Complaint ¶¶ 24–25.

Plaintiffs seek (1) permanent injunctive relief, (2) recall and destruction of the infringing lamps, (3) compensatory damages, (4) an accounting of defendants' profits realized in connection with the sale of the Swan, with an award in such amount to plaintiffs, and (5) attorney's fees.

The court has jurisdiction of this matter pursuant to 15 U.S.C. § 1121 (1982), 28 U.S.C. § 1338 (1982), and under the general doctrine of pendent jurisdiction. In accordance with Fed.R.Civ.P. 65(a)(2), the trial of the action on the merits was consolidated with the hearing of the application for a preliminary injunction. This action was tried to the court without a jury.

For the reasons set forth below, the court concludes that plaintiffs have sustained their burden of proof under the federal statute. The evidence leaves no doubt that the subject of this lawsuit, the Dove lamp, is in fact a highly distinctive design. Moreover, plaintiffs have established that (1) the Dove lamp has acquired secondary meaning in the marketplace, and (2) consumers are likely to be confused as to the source of the Swan lamp. Additionally, the court finds that KI violated section 43(a) of the Lanham Act by importing and selling lamps confusingly similar to plaintiffs' Dove lamp and that it did so intentionally. Consequently, plaintiffs are entitled to permanent injunctive relief.[3]

Further, under 15 U.S.C. § 1117(a) (Supp. IV 1986), plaintiffs are entitled to recover KI's profits, costs of the action and reasonable attorney's fees. Since plaintiffs did

---

**1.** At trial, the action against Lisa Lighting, which never filed an answer in this matter, was dismissed without prejudice. Trial Transcript at 14, 565 [hereinafter "Tr. *x* "]; *see* Fed.R.Civ.P. 41(a).

**2.** Plaintiffs also assert a common law trademark infringement claim which is essentially no different from the federal claim.

**3.** At the conclusion of the trial, the court granted plaintiffs a permanent injunction, with a full opinion and order to follow. Tr. 563–64.

not adduce sufficient evidence at trial to prove damages, no compensatory damages will be awarded.

As to defendant Dac Wire, since its participation in the infringement was *de minimus* (Dac sold only 13 lamps) and because it returned all unsold lamps to KI, Dac Wire, while enjoined from further infringement, will not be required to pay damages, profits, attorney's fees or costs in this action.

## BACKGROUND

The Dove, PX 194, 195,[4] is a halogen desk lamp manufactured in Italy by PAF. It is sold in five colors: black, white, red, blue, and yellow. The lamp has a cylindrical base which rotates on a circular platform. Such base is black on all models. On the underside of the base appear, so far as pertinent, the PAF studio logo, the name Dove, the names of the lamp's designers, and "Made in Italy." Two parallel curvilinear struts join the base to a long flat slightly curved arm which flares imperceptibly from top to bottom. The head of the lamp, in which is housed a high intensity bulb, has a graceful configuration: rectangular at the base, the head rises from the back to form a gently sloping mound which tapers off in the front. The head is hinged to the arm, allowing the user to adjust it up or down, and is counterbalanced by a concealed weight evenly distributed within the lower portion of the arm itself. At this point, the arm is hinged to the struts, again allowing one to adjust it up or down. From a practical standpoint, the design allows a full range of motion for desk or table lighting. Overall, the aesthetic effect of the lamp evokes the image of a bird descending or rising in flight. *See* Trial Transcript at 23, 243 [hereinafter "Tr. *x* "]. For example, the struts, which serve the purpose of conducting electricity from the base to the head, resemble the manner in which a bird's feet extend when it prepares to land. *See* Tr. 256. The Dove retails from $160 to $200. Tr. 337; *see, e.g.,* PX 106, 116, 123–25.

Defendant KI imported Swan lamps, PX 196, 197,[5] from a Taiwanese Company, Lon Tai Shing, Ltd. ("LTS"). The Swan is virtually identical in appearance to the Dove, but is sold in only two colors: white and black. Also, the base of the Swan, unlike the Dove, matches the color of the lamp. Thus, a white Swan has a white base while a white Dove has a black base. The underside of the Swan base has no markings disclosing the make, model, manufacturer, or country of origin. The Swan lamp sells at retail for $120. Tr. 337. While ostensibly the differences between the two lamps are minor, the Swan is, in terms of quality, a poor imitation of the Dove. The record is replete with KI's admissions that the Swan has "serious quality problems." Tr. 386.

The genesis of the Dove lamp, and this litigation, was the decision by PAF in 1979 to expand its enterprise from the provincial manufacture and sale of traditional lamps in Italy to a modern design lamp that would sell throughout the world. Tr. 16. To that end, PAF and the Dove have been very successful. The Dove received universal acclaim, was awarded numerous honors, including an Oscar from the French Architects Association, and ultimately has become the second best selling desk lamp in the world. PAF increased in size from a company of fifteen employees in 1984 to over one hundred employees in 1988. This substantial growth has been a direct result of PAF's development of the Dove. Tr. 63; *see* Plaintiff's Exhibit 166 at 1 [hereinafter "PX *n* "]; Tr. 21, 534; *see also* Declaration of Luigi Giroletti at 4.

From the start, the company's strategic goal was to develop a product that would help make PAF a recognizable name with consumers. Tr. 16–17. Giroletti, managing director of PAF, testified: "[O]ur effort was to have a completely different lamp." *Id.* "We invested in research ... in machinery, in tooling ... our effort was to identify this lamp with our firm." Tr. 22. To achieve this end, PAF hired two architects, Mario Barbaglia and Marco Co-

---

**4.** A picture of the Dove lamp appears *infra* as Appendix A.

**5.** A picture of the Swan lamp appears *infra* as Appendix B.

lombo, Italian industrial designers, to undertake the design of the new lamp. To the date of trial, PAF had already paid royalties to Messrs. Barbaglia and Colombo in excess of one million dollars. Tr. 17, 62–63; *see also* PX 1–2 (contract royalty agreement between PAF and the lamp designers).

The results of PAF's efforts were impressive. The Dove lamp made its premiere in September 1985 at the Euroluce International Lighting Exhibition in Milan, Italy, where it became an instant success. Tr. 21. This success was important to PAF because the Euroluce Exhibition is regarded as the preeminent international lighting exhibition, Tr. 24–26, and the Dove won considerable acclaim there from designers, architects, museums and journalists. Tr. 21.

Following the Euroluce Exhibition, the Dove was featured prominently in a complimentary article written by Suzanne Slesin [6] for the *New York Times,* entitled "The Slender Minimalist Look Stars at the Milan Fair." *N.Y. Times,* Sept. 26, 1985, at C1, col. 5 (picture of the Dove lamp covers the width of the page). PX 82. In the article, the Dove is described as having an "attenuated birdlike shape," and both Messrs. Barbaglia and Colombo are mentioned as having designed the lamp for PAF. *Id.*

PAF enjoyed great success with its new product. The Dove received numerous international awards for its design, and laudatory letters from museums around the world requesting the lamp for exhibition were sent to PAF. Further, the lamp appeared on the cover of the *International Design Yearbook* for 1985–1986, edited by Phillipe Starke, a famous contemporary French designer. Tr. 46; PX 32; *see also* PX 82 (*N.Y. Times,* Sept. 26, 1985, at C1, col. 5, acknowledging Phillipe Starke as one of France's major talents in the field of design). In the United States, the editors of *Modern Style* chose to include the Dove as part of an eclectic catalog, a source book of interior design dating from the 1930's to contemporary post-modern designs. PX. 17.

In addition to, and as a result of, the significant public attention given the Dove, PAF committed itself to a full scale marketing campaign, expending over ninety percent of its marketing budget to promote the Dove. Tr. 116. PAF's marketing strategy was to target upscale, sophisticated consumers (those who typically would be interested in design), to emphasize the appearance of the product so that people would immediately recognize it, and to make the Dove lamp "the symbol of PAF." Tr. 32, 34, 37–38.

The company implemented a three step program for advertising in the world market. First, PAF advertised in specialty magazines originating in Italy but sold internationally, including the United States. Giroletti explained the reason for this approach. Italy is renowned for the best in new design, both in furniture and clothing. Tr. 247, 315. Consumers interested in fine design initially consult Italian and European magazines. Tr. 293. "[If] customers in the United States wanted special Italian or European items, they [would] buy magazines ... made in Italy." Tr. 34, 37, 95. Second, PAF built an advertising campaign in Europe, and third PAF then commenced an extensive campaign specifically directed at the United States market. Tr. 35.

KI, which as noted above is a division of defendant Hunter–Melnor, Inc., is an importer of lighting fixtures and accessories. Tr. 345–46. Roy Gomes, president of KI, testified that he originally became aware of the Dove lamp when he saw it advertised in *The Sharper Image* catalog sometime shortly before 1988. Tr. 406–07. On February 6, 1988 LTS (the Taiwanese manufacturer) sent to the purchasing director of KI a letter enclosing a lighting catalog, which included a product called model LTS–614 (the Swan lamp). Tr. 347; PX 142. Mr. Gomes responded to this communication by facsimile, dated February 16, 1988:

We have received your Feb. 6, letter enclosing illustration of Model LTS–614. This seems to be similar to a European produced lamp. We wish to order imme-

6. Suzanne Slesin is the journalist who coined the widely used expression "high-tech." Tr. 124.

diately ... and we guarantee you volume sales ... Products such as [LTS-] 614 ... are in the luxury category, selling through lighting wholesalers, furniture stores and top quality department stores. They appeal to an elite, sophisticated market, willing to pay a high price— more for the design aspect of the lamp than for the functional aspect. This same customer will not buy a product that is commonly distributed everywhere for the obvious reason that it is no longer unique.... We strongly recommend you consider exclusive distribution through us.

PX 141.

In the same facsimile communication, Gomes acknowledged that the Dove was presently being sold in the United States. *Id.; see also* Tr. 356; Defendant's Exhibit 1 at 36 [hereinafter "DX *n* "] (Deposition of Roy Gomes, dated Oct. 17, 1988). Gomes also inquired as to whether a design patent had been issued for the Dove. Two weeks later Gomes ordered, sight unseen, 1000 units of model LTS–614, *see* PX 144, which he himself renamed the "SWAN." Tr. 361; *see also* DX 1 at 50. Upon receiving the first shipment of Swan lamps, Gomes sent another facsimile dated March 15, 1988 to LTS, stating exultantly, "Our congratulations! We drink champagne to your *excellent reproduction.*" PX 144 (emphasis added).

Gomes became aware of the legal principle of trade dress protection in the spring of 1988 when his attorney sent him a copy of the decision in *Artemide SpA v. Grandlite Design and Manufacturing Co.*, 672 F.Supp. 698 (S.D.N.Y.1987); *see* Tr. 440. That case involved another Italian lamp— the Tizio—where the court granted a preliminary injunction, reiterating the legal principle that trade dress protection extends to product designs. *Id.* at 708.

KI commenced selling the Swan on July 7, 1988 at a trade show in Dallas, Texas. Tr. 395. Gomes testified that because no design patent had issued for the Dove, he thought he could sell the Swan freely, without fear of litigation.[7] Tr. 396. Plaintiffs

maintain a year-round showroom at the Dallas tradeshow, and it was there, notably on KI's first showing of its Swan lamp, that plaintiffs discovered the existence of defendants' lamp. Tr. 225. The Dove was also on exhibit at the tradeshow, and as Gomes stated, several customers commented that the Swan looked just like the Dove. Tr. 407.

Plaintiffs, shortly thereafter, sent a letter dated August 4, 1988 to defendants demanding that they immediately terminate all sales and advertising of the imitator lamp and explaining the basis for plaintiffs' claim of trade dress infringement. PX 166, 209. Defendants, however, failed to comply with plaintiffs' demand. It is against this background that the present litigation was instituted.

Defendants contend that they may sell the "Chinese copy" with impunity. They maintain: first, that the design of the Dove is purely functional, hence unworthy of trade dress protection; second, that consumers do not associate the Dove with PAF, *i.e.*, the Dove has not acquired secondary meaning; third, that KI does not purport to sell the original Dove and will distinguish its Swan by placing a KI logo on the base of its product; and finally, defendants insist that if they have infringed plaintiffs' "trade dress" in copying the Dove, they have done so in good faith.

Plaintiffs argue that the Dove has received worldwide recognition, and sophisticated consumers recognize it as a distinctive Italian designer lamp. More, plaintiffs maintain that while very functional as an adjustable halogen desk lamp—of which there are literally hundreds—the design of the Dove simply does not dictate its function. Continuing, plaintiffs maintain There are many lamps that differ radically in design but perform essentially the same function, *i.e.*, to provide high intensity, adjustable desk lighting. Finally, plaintiffs insist that a "KI" logo placed on the Swan will do little, if anything, to prevent consumers from confusing the two products.

---

**7.** *See* discussion on issue of design patents *infra* notes 9, 15, 19, 21.

## DISCUSSION

### I

Section 43(a) of the Lanham Act [8] establishes a federal law of unfair competition that protects against false designation of origin, *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 75 (2d Cir.1985), and entitles "the first manufacturer of a product to an unregistered trademark in the 'trade dress' of its product." *Stormy Cline Ltd. v. Pro-Group, Inc.*, 809 F.2d 971, 974 (2d Cir. 1987). Although trade dress traditionally referred to the packaging or labeling of a product, it is by now axiomatic that "the *design* of a product itself may function as its packaging," hence protectable trade dress. *Brandir Int'l, Inc. v. Cascade Pacific Lumber, Co.*, 834 F.2d 1142, 1148 (2d Cir.1987) (emphasis added). The trade dress of a product "involves the total image of the product and may include features such as size, shape, color or color combinations, textures, [or] graphics." *John Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir.1983).

To succeed under a § 43(a) claim, plaintiffs must prove (1) that the trade dress of their product has acquired secondary meaning among the relevant consumer group, and (2) that there exists a likelihood consumers will confuse the source or sponsorship of defendants' product with their own. *Centaur Communications Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1221 (2d Cir.1987); *Stormy Cline*, 809 F.2d

at 974; *see also Girls Club of America v. Boys Club of America*, 683 F.Supp. 50, 52–53 (S.D.N.Y.), *aff'd mem.*, 859 F.2d 148 (2d Cir.1988). However, even if plaintiffs meet this burden, defendants may still prevail if the design of the product is functional. The burden of proof in this respect rests squarely with defendants. *LeSportsac*, 754 F.2d at 76.

### FUNCTIONALITY

■ Defendants' initial contention is that the Dove lamp has a purely functional design, and as such, without the benefit of a design patent,[9] may be freely copied. The Supreme Court in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850–51 n. 10, 102 S.Ct. 2182, 2186–87 n. 10, 72 L.Ed.2d 606 (1982), defined a functional feature as one "essential to the use or purpose of the article or [that] affects the cost or quality of the article." Nevertheless, merely because a design feature also performs a function does not make it "essential" to the purpose of the article. The design of a product must be viewed in its totality. *See LeSportsac*, 754 F.2d at 76. "Thus, the true test of functionality is not whether the [design] in question performs a function, but whether the [design] 'is dictated by the function[ ]....'" *Brandir Int'l*, 834 F.2d at 1148 (quoting *Warner Bros. Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 331 (2d Cir.1983)). In making this determination of functionality, courts look at the availability of alternative designs or constructions. *Id.; Bruns-*

---

**8.** Section 43(a), 15 U.S.C. § 1125(a), provides:
Any person who shall affix, apply or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

The purpose of this section is to "prevent consumer confusion regarding a product's source, and to enable those that fashion a product to differentiate it from others on the market." *Centaur Communications Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1220 (2d Cir.1987) (citation omitted).

**9.** Lack of a design patent does not preclude plaintiffs from asserting a § 43(a) claim. *See* discussion on issue of design patent *infra* notes 15, 19, 21. Moreover, the holder of a legal trademark, in this case unregistered trade dress, "is under no obligation to give advance notice of its rights to an infringer before seeking damages or injunctive relief for infringement." *See Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F.Supp. 899, 911 (E.D.N.Y.1988).

*wick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 519 (10th Cir.1987); *Metro Kane Imports, Ltd. v. Rowoco, Inc.*, 618 F.Supp. 273, 275–276 (S.D.N.Y.1985) (Metro II), *aff'd mem.*, 800 F.2d 1128 (2d Cir.1986); *Ideal Toy Corp. v. Chinese Arts & Crafts Inc.*, 530 F.Supp. 375, 378 (S.D.N.Y.1981).

The reason for this kind of analysis is clear:

> [C]ourts must be sensitive to whether a grant of trade dress protection would close all avenues to a market that is otherwise open in the absence of a valid patent. This threat is particularly great when ... a first manufacturer seeks broad trade dress protection for a product on the ground that its arrangement of *predominantly functional* features is distinctive.... [The court must, however, balance] this purpose with the Lanham Act's purpose of preventing confusion as to the source of products, [and the correct inquiry in a functionality defense is whether trade dress protection] 'will hinder competition or impinge upon the rights of others to compete effectively in the sale of goods.'

*Stormy Cline*, 809 F.2d at 977–78 (emphasis added) (citations omitted). As pointed up in *Stormy Cline*, the test "encourages those seeking trade dress protection for their products to select distinctive nonfunctional identifying marks." *Id.* at 979.

Applying the test of functionality, as articulated in the above-cited cases, the court concludes defendants have failed to meet their burden in proving functionality. As noted earlier, evidence of alternative constructions that perform the same function militate strongly against a finding of functionality. *Brandir Int'l*, 834 F.2d at 1148; *see also Schwinn Bicycle Co. v. Ross Bicycles*, 678 F.Supp. 1336, 1349–52 (N.D.Ill. 1988). Here, plaintiffs introduced a plethora of exhibits, both actual halogen desk lamps and photographs of other such lamps, which persuade the court that there exist myriad design alternatives to the Dove lamp. Tr. 185–86, 250; PX 135, 194–202, 206. Moreover, KI's candid admission in its memorandum to LTS that consumers are willing to pay a high price more for the design aspect of the lamp than for the functional aspect serves to buttress this conclusion. *See* PX 141.

At trial, defendants attempted to analytically disassemble the Dove into disparate functional components. *See* Tr. 161–86, 266–83. In doing so, however, defendants by contradistinction merely accentuated the testimony of plaintiff's expert witness, Merle Edelman, who opined the Dove should be viewed, not with an eye toward its separate functional elements, but in its entirety, more for its purely aesthetic appeal. Tr. 249–53; *See Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1272 (10th Cir.) (a combination of features may be nonfunctional and thus protectable, even though the combination includes functional features), *cert. denied*, —— U.S. ——, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988); *see also Schwinn Bicycle*, 678 F.Supp. at 1351 (trade dress protection depends on whether the design as a whole is functional, not whether component features viewed individually are functional); *cf. Sunbeam Corp. v. Equity Industries Corp.*, 635 F.Supp. 625, 636 (E.D.Va.1986) (where the overall design is found to be functional, the court must reject any attempt to break that design into its various components).

The short of the matter is that the Dove is a highly distinctive, aesthetically appealing lamp, not a predominantly functional lamp.

Defendants point out that it is precisely this aesthetic appeal which is an essential feature of the lamp's design, making it an " 'important ingredient in the commercial success of the product.' " *LeSportsac*, 754 F.2d at 77 (citing *I.A. Fratelli Saporiti v. Charles Craig, Ltd.*, 725 F.2d 18, 19–20, (2d Cir.1984)) (quoting *Ives Laboratories v. Darby Drug Co.*, 601 F.2d 631, 643 (2d Cir.1979)); *see* Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction at 12. Defendants' reliance on the above cases is, however, misplaced. Aesthetic functionality has been rejected in this circuit as a standard for determining functionality in trademark infringement actions, *Demetriades v.*

*Kaufmann,* 680 F.Supp. 658, 667 n. 15 (S.D.N.Y.1988) (citing *Morex S.P.A. v. Design Inst. Am., Inc.,* 779 F.2d 799, 801 (2d Cir.1985) (per curiam)). The court recognizes that a distinctive design which is an "important ingredient" in the commercial success of a product may be protectable trade dress. *Stormy Cline,* 809 F.2d at 977.

Moreover, there is no evidence that the Dove is less costly to manufacture than other similar halogen lamps. Indeed, on cross-examination, plaintiffs' expert witness stated that the production methods used in the manufacture of the Dove made it more expensive to produce. Tr. 275–76. In a similar vein, Thomas Lowy, president of plaintiff K & L, testified that using a concealed counterweight in the arm made the production process for the Dove more difficult than that of other halogen lamps. Tr. 203.

Significantly too, defendants presented no evidence of their inability to compete effectively in the industry without copying plaintiffs' trade dress. Defendants offered no evidence that KI considered alternative designs for its product, or that it made engineering studies or studies of manufacturing costs. Considering the number of halogen lamps plaintiffs presented as evidence of alternative designs that perform essentially the same function as the Dove, manifestly defendants are not precluded from competing in the sale of similar halogen desk lamps.

In sum, the court finds that defendants have failed to meet their burden in proving functionality. The design of the Dove lamp is simply not dictated by its function.

SECONDARY MEANING

■ A trademark, or in this case trade dress, acquires secondary meaning when it can be demonstrated that consumers associate the product with a particular source. *Yarmouth–Dion, Inc. v. D'ion Furs, Inc.,* 835 F.2d 990, 993 (2d Cir.1987). It is merely necessary, however, to show that a substantial segment of the relevant consumer group makes the association between the product and a single, albeit anonymous source. *Centaur,* 830 F.2d at 1221–22.

"[T]he crux of the doctrine of secondary meaning 'is that the mark comes to identify not only the goods but the source of those goods,' even though the relevant consuming public might not know the name of the producer." *Id.* (citing *20th Century Wear, Inc. v. Sanmark–Stardust Inc.,* 815 F.2d 8, 10 (2d Cir.1987) (*20th Century II*)) (quoting *Ralston Purina Co. v. Thomas J. Lipton,* 341 F.Supp. 129, 133 (S.D.N.Y.1972)); *see also Volvo N. Am. v. Men's Int'l Tennis Council,* 687 F.Supp. 800, 812 (S.D.N.Y.1988); *Demetriades,* 680 F.Supp. at 668 (unregistered trade dress entitled to § 43(a) protection when it stands out with the buying public as a mark of distinction).

The focus, therefore, of secondary meaning is the relevant consumer group:

Although the mark owner strives to create a secondary meaning for its product, it is the consuming public which, in effect, determines whether that effort has succeeded.... [I]t is not always the *general* public's understanding but—depending upon the product—often only a segment of consumers that need be examined.

*Centaur,* 830 F.2d at 1221 (citations omitted) (emphasis in original); *cf. American Cyanamid v. Campagna Per Le Farmacia in Italia S.P.A.,* 847 F.2d 53, 55 (2d Cir.1988) (relevant consumer group consisted of high income pregnant women). In this case, the court finds the relevant consumer group consists of those persons interested in home and office design, including architects, designers, decorators, and upscale sophisticated consumers. Tr. 34–37, 95–96, 150, 301; *see also* Tr. 321–23. The evidence clearly demonstrates that both the Dove and the Swan were targeted for this select group. Hence, Lowy testified on direct examination:

Q. Is there a particular type of retail store that sells the Dove lamp?

A. Basically, the few fine department stores, the best lighting stores, and the best furniture stores.

Tr. 138; *see also* Tr. 232.

Again, defendant KI's memorandum to LTS serves to buttress this conclusion: "Products such as the [Swan] ... are in the

luxury category, selling through ... furniture stores and top quality department stores. They appeal to an elite, sophisticated market, willing to pay a high price.... This same customer will not buy a product that is commonly distributed everywhere...." PX 141.

■■■ " 'Proof of secondary meaning entails vigorous evidentiary requirements.' " *Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir.1985) (quoting *Ralston Purina*, 341 F.Supp. at 134). Factors to be considered in determining whether a product's trade dress has acquired secondary meaning include: (1) sales success; (2) the senior user's advertising expenditures; (3) unsolicited media coverage of the product; (4) consumer surveys; (5) intentional copying of the product; and (6) length and exclusivity of the product in the market. *815 Tonawanda St. Corp. v. Fay's Drug Co.*, 842 F.2d 643, 648 (2d Cir.1988). However, as noted in *Thompson Medical*, every element need not be proved and no single factor is determinative. 753 F.2d at 217.

Plaintiffs submit they need not prove secondary meaning because the trade dress of the Dove is so distinctive that in the realm of product design it must be considered arbitrary or fanciful,[10] or that the trade dress is more analogous to distinctive packaging, which under New York law is protected without proof of secondary meaning. *See Perfect Fit Indust., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 953 (2d Cir. 1980) (secondary meaning not important in the realm of trade dress because monopoli-

zation is not a problem. There are endless possible varieties of advertising *displays* and *packaging* (emphasis added)), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982). Without addressing New York law on the subject of unfair competition, the court emphasizes that under federal law non-verbal marks that are unregistered, such as designs, unlike arbitrary or suggestive marks, always require proof of secondary meaning. *Union Mfg. Co. v. Han Baek Trading Co.*, 763 F.2d 42, 48 (2d Cir.1985), *cited in Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 1577 n. 3 (Fed.Cir.1988); *but see Metro Kane Imports v. Federated Dept. Stores*, 625 F.Supp. 313, 317 (S.D.N.Y.1985) (*Metro III* ) (suggesting that a highly distinctive design may be considered so suggestive that secondary meaning need not be proved), *aff'd sub nom. mem., Metro Kane Imports v. Brookstone Co.*, 800 F.2d 1128 (2d Cir. 1986); *see also Brunswick*, 832 F.2d at 517 n. 2 (10th Cir.1987) (collecting cases); *Harland*, 711 F.2d at 981 n. 25.

*Sales Success*

The Dove is the second best selling lamp in the world and in the United States.[11] Tr. 21, 304–05, 534–35; *see also* PX 166 at 1. It has enjoyed tremendous worldwide sales for a new product. Thus, since September 1985 there have been over 200,000 units sold and sales in the United States have increased at a phenomenal annual rate of approximately fifty percent.[12] Tr. 55–59; PX 183. Significantly, the lamp accounts for sixty percent of PAF's total sales, of

---

**10.** In *trademark* cases, verbal marks are entitled to varying degrees of protection, depending on whether they are classified as (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. *See Girls Club of America*, 683 F.Supp. at 52. Descriptive terms require a showing of secondary meaning while suggestive or arbitrary terms do not. *See Volvo*, 687 F.Supp. at 811. The general analysis in *trade dress* infringement does not, however, include the distinctions between "descriptive" and "suggestive" types of designs, but is limited to the difference between "functional" designs, which are never protectable trade dress, and "distinctive" designs. *Metro III*, 625 F.Supp. at 317 n. 1.

**11.** The best selling lamp is the Tizio lamp, *see* Tr. 304–05, which at this writing is the subject of another trade dress infringement action. In

*Artemide SpA v. Grandlite Design and Manufacturing Co.*, 672 F.Supp. 698 (S.D.N.Y.1987), Judge Cannella granted a preliminary injunction to the Italian manufacturer of the lamp. The case was then transferred to the District Court in New Jersey, No. 87–2394, and is presently pending trial on the merits. The Dove is second, perhaps, because it has not been on the market as long as the Tizio. *See Artemide* at 701 (Tizio has been on the market since 1972). It is quite possible, based on its present sales growth per annum figures, that the Dove may yet become the best selling desk lamp in the world. *See* Tr. 55–59.

**12.** Actual sales figures for the Dove are confidential, subject to a protective order. *See* Order dated October 28, 1988.

which the American market comprises twenty percent. Tr. 290. And importantly, as noted earlier, PAF has already paid designers of the lamp, Messrs. Barbaglio and Colombo, over one million dollars in royalties. Tr. 17, 62–63; PX 1–2.

Plaintiffs' witness Mitchell Steinberg, the owner of a retail lighting store, testified that he has been selling the Dove for the past four years, and that it is a very popular lamp. Tr. 304–05. Steinberg further stated that out of the hundreds of different lamp styles he carries in his store, the Dove is distinctive, and that it strikes an image in the minds of customers:

> The Dove lamp stands out. It is very elegant. It has a certain something that most lamps are lacking.... Many customers come in and ask for the lamp simply as the Dove. Some come in and ask for the lamp as the PAF Dove. Some come in knowing the lamp they want to buy, they have seen it in a magazine ... and they describe it as a bird.... Then they will walk around the showroom floor. When they see it, they will point out [sic] to it, and they will say, ah, that's the lamp I want.... A good number of customers will ask if the lamp is from Italy.

Tr. 305–06, 316.

*Senior User's Advertising Expenditures*

To date, PAF has spent over two million dollars advertising the Dove in international design magazines and interior design trade magazines in the United States. Tr. 289; *see, e.g.,* PX 9–87. In contrast, KI has spent no money advertising its Swan. Tr. 360.

Essentially, then, the Dove has been extensively advertised since 1985 in media intended to reach the United States market. Tr. 34–46, 64; PX 19–23, 26–27, 30–31, 34–40, 44–48. Plaintiffs introduced evidence that architects, designers, decorators and retailers would usually subscribe to such magazines. Tr. 95, 150, 218–21, 247, 302–03, 308 (principal foreign magazines are

*Abitare, Casa Vogue, Interni,* and *Domus*). The Dove was advertised in May, 1985 in *Interior Design,* which is the largest circulation trade magazine of interior design in the United States. Tr. 506, 519–21; PX 207. It was advertised in *Designer Magazine,* another trade magazine read by designers and architects in the United States. Tr. 521–22; PX 208. In many of these advertisements, the name PAF appears, usually in bold letters alongside a picture of the Dove.

In addition to advertising in the print media, PAF spent approximately $100,000 annually for exhibiting the Dove at trade shows in major cities throughout the United States.[13] Tr. 54. PAF also spent approximately another $100,000 annually to produce lighting catalogs which feature the Dove as the "symbol of PAF." Tr. 32, 54, 116. PAF even made bags which included a picture of the lamp and the name PAF printed on the bags as promotional giveaways. Tr. 55.

Interestingly too, the Dove has received substantial free advertising in the United States from such widely recognized companies as The Sharper Image, Bloomingdales, Scandanavian Design Gallery and Pottery Barn. Tr. 48–52; PX 89, 123–28. For example, *The Sharper Image* catalog, which has an estimated monthly circulation of twenty million readers in the United States, advertised the Dove in September and November 1987 and in January 1988. PX 123–25. While not mentioning PAF by name in the advertisement, the advertising copy reads, "Italy puts sunshine in a dramatic halogen lamp." Indeed, it was in such a catalog that Gomes testified he first saw the Dove lamp. Tr. 407.

The lamp is chic. Companies other than PAF use the Dove in the background of, or to complement, their own advertisements. It is used by set designers in film, television and magazines. Tr. 127, 302–03. For example, the lamp appears in an "ad slick" for a Macy's two day furniture sale. PX 118 (sale of leather sofas and living

---

**13.** Such cities include New York, Chicago, San Francisco, Los Angeles, Dallas, and Fort Lauder- dale. Tr. 139.

room sets with a Dove lamp alongside the furniture). The Dove appears in a full two page advertisement for Toshiba executive computers in the *New York Times* Sunday Magazine Section. PX 133 (N.Y. Times, Jan. 17, 1988 § 6 (Magazine) at 8–9 ("Toshiba has the arrogantly understated designer look that makes other companies wish they had Toshiba style," with a picture of the Dove lamp next to the computer).

### Unsolicited Media Coverage

Although the Dove is a relatively new product, no other halogen desk lamp, except for the Tizio, has generated so much excitement in the field of design in recent years. The lamp has garnered numerous awards and international recognition from designers, architects, and museums.[14] As noted *supra* p. 7, it was chosen by Phillipe Starke, an internationally recognized designer, to appear on the cover of the *International Design Yearbook* for 1985–1986. The Dove appeared prominently in an article in the *New York Times* covering the Euroluce lighting exhibition. All these commentators pointedly credit PAF and Messrs. Barbaglia and Colombo with the creation of the Dove lamp.

### Intentional Copying

Without peradventure of doubt, defendants deliberately copied the Dove lamp; there is no evidence to the contrary. The Dove and Swan, even when viewed side by side, are virtually indistinguishable. KI's contention that it did not copy the Dove but merely purchased the Swan from a Taiwanese manufacturer is utterly devoid of merit. True, defendants did not manufacture the product. Nevertheless, in selling the lamp they knowingly became part of the chain of distribution, and as such are liable for the results of any infringement. *See Bambu Sales, Inc. v. Sultana Cracker, Inc.,* 683 F.Supp. 899, 912 (E.D.N.Y.1988).

Proof of intentional copying is persuasive, if not conclusive evidence of secondary meaning. *20th Century II,* 815 F.2d at 10; *Shen Mfg. Co. v. Suncrest Mills, Inc.,* 673 F.Supp. 1199, 1203 (S.D.N.Y.1987) ("failure to prove secondary meaning immaterial where trade dress was intentionally copied") (citing cases); *accord M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 448 (4th Cir.1986) (intentional copying may create a presumption of secondary meaning); *Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1016 (9th Cir.1985) (proof of exact copying can be sufficient to establish secondary meaning), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986); *but see Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 678 F.Supp. at 1342 n. 8 (proof of intentional copying by itself does not eliminate the need for additional proof of secondary meaning).

The record plainly establishes that defendants sought to gain an advantage at the expense of and via the reputation of an internationally recognized product. Gomes was fully aware, even before he placed his order with LTS, that the Dove was a European lamp. Moreover, the court finds incredible Gomes' testimony that he had never seen the Dove lamp until presumably late 1987 when he saw it in a *Sharper Image* catalog. Tr. 407. Considering that Gomes is an intelligent and highly sophis-

---

**14.** Designers include Achille Castiglioni, judge of the sixth Arango International Design exhibition. The Arango Foundation, a non-profit organization founded to promote good industrial design in the United States, commissioned Mr. Castiglioni to judge an exhibition of what it considered to be the very best in lighting design. The Dove won special recognition. Tr. 122–23; PX 6. Mr. Giroletti, managing director of PAF, referred to Mr. Castiglioni as "the father of lamps," Tr. 29, and Mr. Lowy called him the greatest lighting designer of the twentieth century. Tr. 122–23.

Architects include the French Architect's association, *Le Bureau du Syndicat National des Architectes D'Interieur,* which in 1987 awarded PAF an Oscar for the Dove lamp. The award was given during an international lighting exhibition in Paris. The Dove was selected over literally thousands of lamps shown at the exhibition. Tr. 28–29; PX 5.

Museums include the following: *Museo Tamayo* in Mexico City, Mexico, *see* PX 3; *Museum für Kunst und Gewerbe* in Hamburg, West Germany, *see* PX 8 (museum book showing great designs throughout the ages and where they are located in the museum includes a picture of the Dove lamp); *Die Neue Sammlung Staatliches Museum für angewandte Kunst* in Munich, West Germany, *see* PX 4; *Cooper–Hewitt Museum* in New York City. Tr. 87.

ticated businessman, indeed a lighting specialist with years of experience in the industry, and admittedly a man with an eye for design, Tr. 354, it is extremely unlikely that he was unaware of the existence of the Dove, especially when he admittedly had been in Italy to lighting shows at the very same time the Dove lamp was receiving international acclaim. Tr. 507–09. Gomes concededly had also seen the Dove in the *New York Times* feature article covering the Euroluce lighting exhibition in Milan. Tr. 454–55. Furthermore, defendants were fully aware that the Dove had been selling in the United States for some time. Tr. 356; PX 141; DX 1 at 36; and defendants' attorney advised defendants that while he thought the Swan did not infringe the Dove, he nonetheless suggested the Swan be labeled to avoid consumer confusion with the Dove. Tr. 440–42. Additionally, such picturesque statements by KI's corporate officer as, "We drink champagne to your excellent reproduction"; "This lamp is intended for an elite, sophisticated market"; and "We desire exclusivity," all made without even having seen model LTS–614, amply demonstrate KI's deliberate decision to capitalize on the costly and successful promotional efforts of PAF in selling the original Dove lamp.

The most telling evidence, however, of intentional copying is the decision by Gomes to rename the birdlike imitator lamp the SWAN. Tr. 361, 366–67, 414; DX 1 at 50. Courts in this circuit have recognized that " 'the second comer has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer.' " *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir.1987) (quoting *Harold F. Ritchie, Inc. v. Chesebrough–Ponds, Inc.*, 281 F.2d 755, 758 (2d Cir. 1960)); *see also Readers Digest v. Conserv-*

*ative Digest, Inc.*, 821 F.2d 800, 804 (D.C. Cir.1987) (striking similarity between trade dress of plaintiff's product and defendant's product is itself probative of intentional copying); *20th Century Wear, Inc. v. Sanmark–Stardust Inc.*, 747 F.2d 81, 91 (2d Cir.1984) (*20th Century I*) (court may infer intentional copying where competitors are selling identical products in the same market), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985).

Finally, David Cohen, owner of defendant DAC Wire Corp., candidly conceded that he ordered the Swan because it was a copy of the Dove and he knew that the Dove had caught the public eye. Tr. 333, 335–36.

Plainly, then, defendants' claim that KI sought to reproduce the Dove simply because it was a beautiful design, *see* Tr. 408, is unsubstantiated by the record.

*Consumer Survey*

Plaintiffs presented no evidence of a consumer survey that linked the Dove lamp to an Italian manufacturer. While consumer surveys have come to be regarded as the most common method of proving secondary meaning, *See Centaur*, 830 F.2d at 1223; *Metro III*, 625 F.Supp. at 315, injunctive relief will not be denied where, as in this case, there is other evidence of secondary meaning, despite plaintiff's failure to introduce the results of such a survey. *Girls Club of America*, 683 F.Supp. at 53 & n. 2; *Schwinn Bicycle*, 678 F.Supp. at 1342–1343; *Shen Mfg. Co.*, 673 F.Supp. at 1204; *cf. Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d at 1583 (consumer survey not needed to prove "acquired distinctiveness").

*Length and Exclusivity*

Since 1985 PAF has been the exclusive manufacturer of the Dove lamp.[15] Defen-

---

**15.** In 1988, there was an instance of copying when another Italian company attempted to market a product identical to the Dove lamp. This dispute was settled between the parties. Under Italian law, *preuso* affords protection to newly designed products that have been on the market for over one year. Tr. 106–07. This may have been a reason why PAF never deemed it necessary to file for a design patent in the

United States. Unfortunately, United States law concerning design patents is different. Under 35 U.S.C. § 102(b) (1982), a person is entitled to a design patent *unless* his product has been on sale or in public use for more than one year prior to his application for a patent. Because plaintiffs have been selling the Dove for more than one year in the United States, plaintiffs are presently ineligible for patent protection in this

dants contend, however, that because PAF"s initial advertising efforts were directed at the international and European markets, the Dove has not received sufficient recognition in the United States market to have attained secondary meaning. Specifically, defendants point out that the high concentration of United States advertising began only on January 1, 1988 when K & L became the exclusive distributor of the Dove.[16] *See* Tr. 111. Defendants urge that because of this belated advertising in the United States, plaintiffs have failed to establish that the Dove had acquired a strong secondary meaning by July 7, 1988 when KI first sold its Swan lamp. *See Thompson Medical,* 753 F.2d at 217 (citing *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1043 (2d Cir.1980)).

Unfortunately for defendants, the facts destroy their argument. From February 1, 1988 to July 1, 1988 the Dove, in addition to the aforementioned advertising, appeared weekly in the *New York Times,* usually in the Thursday Home Section. Tr. 214, 306. It has been advertised in American magazines such as *House Beautiful,* PX 88, and *Interior Design Magazine.* PX 131. The Dove has also been advertised in national and local newspapers around the country, including: *Newsday,* PX 99; the *Philadelphia Inquirer,* PX 94; *The Hartford Courant,* PX 119; *The Sacramento Bee Final,* PX 115; *The Times–Picayune,* PX 95; and *Home Furnishing Daily* (newspaper which has a full time staff covering the lighting industry did a story about the Dove mentioning both PAF and K & L) Tr. 524; PX 210.

Weekly advertising over a period of six months in the *New York Times,* coupled with contemporaneous advertising in other publications, added to the previous years of advertising and unsolicited media coverage, does much to establish a finding of secondary meaning in this case.

In trade dress cases, a product design may take longer than a wordmark to ac-

quire secondary meaning, *Keystone Camera Prod. Corp. v. Ansco Photo–Optical Prod. Corp.,* 667 F.Supp. 1221, 1231 (N.D. Ill.1987) (one year and five months use of trade dress considered too short-lived to establish secondary meaning); *see also Sunbeam Equity,* 635 F.Supp. at 630. Nevertheless, even assuming *arguendo* that plaintiffs' trade dress has not yet acquired secondary meaning, where as here, it is demonstrated that a product is expanding in a new market, and where there is an intentional, deliberate attempt to capitalize on another's distinctive product, secondary meaning in the making is also entitled to protection. *L.A. Gear, Inc. v. Thom McAn Shoe Co.,* No. 88–6444, slip op. at 30 (S.D. N.Y. April 19, 1989); *see also Jolly Good Indus., Inc. v. Elegra, Inc.,* 690 F.Supp. 227, 230–31 (S.D.N.Y.1988); *Elizabeth Taylor Cosmetics Co. v. Annick Goutal, S.A. R.L.,* 673 F.Supp. 1238, 1244 (S.D.N.Y. 1987); *Metro III,* 625 F.Supp. at 316, 317 (distinguishing *Thompson Medical* 753 F.2d at 217 and *Saratoga Vichy* 625 F.2d at 1043); *National Lampoon, Inc. v. Amer. Broadcasting Co.,* 376 F.Supp. 733, 747 (S.D.N.Y.), *aff'd,* 497 F.2d 1343 (2d Cir.1974).

However, the record establishes far more than secondary meaning in the making. In the instant case, a number of factors convince the court that the Dove has acquired secondary meaning in the relevant consumer market. First, the product has a special marketing niche; it is purposely not sold to all stores, but selectively to top-of-the-line furniture and department stores. Second, persons likely to purchase the Dove read or subscribe to Italian design magazines such as *Interni, Casa Vogue,* or *Domus.* Third, considering the initial brouhaha over the Dove at the Euroluce Lighting Exhibition and the subsequent recognition of the lamp as an important contribution to modern design by eminent members of the profession, the court concludes that this lamp is well recognized, at the very least, as an Italian designer lamp. Finally, in a rela-

---

country. *See* discussion on design patent *supra* note 9 and *infra* notes 19, 21.

**16.** On that date, PAF joined forces with its now sister corporation, Koch + Lowy. Both PAF and K & L were acquired by the Chartwell Group in January 1988. Tr. 14, 93.

tively short period of time, less than four years to be precise, the Dove has become the second best selling lamp in the world. The court thus finds plaintiffs have sufficiently established secondary meaning to sustain a claim under § 43(a) of the Lanham Act.

## LIKELIHOOD OF CONFUSION

To succeed under their Lanham Act claim, plaintiffs must demonstrate that " 'an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused as to the source of the goods in question.' " *Charles of the Ritz Group, Ltd. v. Quality King Distributors, Inc.*, 832 F.2d 1317, 1321 (2d Cir. 1987) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)). In trademark infringement cases, once demonstrated, likelihood of confusion also establishes the requisite irreparable harm. *Id., cited in McNeil, Inc. v. American Home Products Corp.*, 848 F.2d 34, 38 (2d Cir.1988); *Church of Scientology Int'l v. The Elmira Mission*, 794 F.2d 38, 41 (2d Cir.1986). Cases involving trade dress infringement are no different. *Keystone Camera*, 667 F.Supp. at 1224.

Judge Friendly's landmark decision in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), presents the recognized analysis for determining likelihood of confusion in trademark infringement actions,[17] and delineates the following eight factors:

(1) The strength of the mark;

(2) The degree of similarity between the marks;

(3) The proximity of the products;

(4) The likelihood that the senior user will bridge the gap;

(5) The junior user's good faith in adopting the mark;

(6) The quality of the junior user's product;

(7) Evidence of actual confusion;

(8) The sophistication of the relevant consumer group.

*See also Orient Express Trading Co. v. Federated Dept. Stores, Inc.*, 842 F.2d 650, 654 (2d Cir.1988). In determining likelihood of confusion, district courts need not review all eight *Polaroid* factors, but "need only consider sufficient factors to reach the ultimate conclusion as to whether … there is a likelihood of confusion," and may consider other factors as well. *Id.*

In the present case some of the factors need little, if any, commentary. The strength of the mark, for example, speaks for itself, *viz.*, the Dove has a highly distinctive design. The degree of similarity between the Dove and the Swan is self-evident; they are virtually identical. In the marketplace, the products are direct competitors and hence the proximity of the products is evident. *Polaroid* factors (5), (6), (7), and (8), however, merit further discussion.

### Good Faith

As discussed *supra*, defendants intentionally copied plaintiffs' trade dress in the Dove lamp. "Intentional copying gives rise to a presumption of likelihood of confusion." *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d at 258, *cited with approval in Charles of the Ritz*, 832 F.2d at 1322; *Centaur*, 830 F.2d at 1227–28; *see also Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 119 (2d Cir.1984). The court's finding of deliberate copying of plaintiffs' trade dress in the Dove clearly demonstrates defendants' bad faith. *See L.A. Gear v. Thom McAn Shoe Co.*, No. 88–6444 slip op. at 22 (evidence of intentional copying will support a finding of bad faith).

### The Quality of the Junior User's Product

At trial, plaintiffs amply demonstrated that the Swan is inferior in quality to the Dove. KI's memorandum to LTS serves to point up the Swan's serious quality problems:

---

**17.** The *Polaroid* analysis originally applied only where the products in question were different. Polaroid now extends to competing products. *Physicians Formula Cosmetics, Inc. v. West Cab-* *ot Cosmetics, Inc.*, 857 F.2d 80, 83 (2d Cir.1988); *Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486, 490 (2d Cir.1988); *Thompson Medical*, 753 F.2d at 214.

We have serious, and I mean serious quality problems with this item. . . .

1. Paint peeling.

2. Plastic melting with ultimate transformer burnout.

3. Plastic case splitting at the seam where attached to upright steel rods.

We are literally being inundated with requests from customers for return of goods authorization.

PX 163; *see also* PX 153.

More, the Swan is wired to the secondary side of the transformer, whereas the Dove is wired to the primary side. This, in effect, means that when one switches off the Dove there is no current in the transformer, whereas in the Swan the transformer is always "on," even when the light is turned "off." Tr. 71–72, 385. According to KI's own memorandum, "this method of construction is unacceptable from a safety point of view and longevity of the product itself." PX 159.

Normally, a marked difference in quality will militate against finding a likelihood of confusion. *But see Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 78 (2d Cir.1988) ("inferior quality product produced by junior user injures the senior user's reputation insofar as consumers might think that the source of the inferior product is the senior user"). However, where the differences are not apparent from a visual inspection of the products, and the products are identical, confusion becomes more likely than not. In the current situation, the only discernible quality difference between the products from a visual inspection is that the Dove has the highly regarded Underwriters Laboratory ("UL") listing [18] while the Swan does not. Tr. 65–62, 365. Although consumers may check to see if a product has UL listing, in the present case the UL listing appears on the underside of the base of the lamp. Consumers rarely pick up lamps to inspect the underside, Tr. 140, and consequently, they are not likely to distinguish between the two products predicated solely on a UL listing.

In sum, the inferior quality of the Swan is a factor entitling plaintiffs to trade dress protection for the Dove. The lamps are virtually identical in appearance, and accordingly there is a significant risk that the public's perception of the Dove as a high quality product will suffer from confusion between the lamps.

*Evidence of Actual Confusion*

While the record contains no direct evidence of actual confusion by consumers, probably the best indirect proof of actual confusion adduced by plaintiffs was the testimony of David Cohen, owner of defendant DAC Lighting Corp. and an expert in the lighting field. At trial, Cohen conceded that he could not distinguish between the Dove and the Swan when both were presented to him. Tr. 331–32. Proof of likelihood of confusion relates not merely to confusion of the two products, but confusion as to source. While there is no evidence in the record that retailers themselves would be confused about the source of the lamps they sell, *see, e.g., Schwinn Bicycle,* 678 F.Supp. at 1344 n. 14, Cohen's inability to distinguish any differences between the two lamps portends the consumers' inability to do the same. Furthermore, evidence of actual confusion is not required to prove a likelihood of confusion, especially where the products, such as those in this case, have been in competition for a short time—three months—before trial. *Centaur,* 830 F.2d at 1227.

*Sophistication of the Relevant Consumer Group*

The relevant consumer group, as we have seen, is relatively sophisticated. Concededly, the sophistication of consumers normally militates against finding a likelihood of confusion. Nonetheless, when the products have a virtually identical design, as here, " '[t]he sophistication of the consumers cannot be relied upon to prevent confusion,' " and depending on the circumstances of the market and the product, may operate to increase confusion. *Banff, Ltd. v. Federated Dept. Stores, Inc.,* 841 F.2d

---

**18.** UL listing is an assurance by the Underwriters Laboratory that a product meets certain quality and safety standards. UL listing is diffi-cult to obtain, and the Underwriters Laboratory performs a monthly quality control check on products that receive its rating. Tr. 65–67.

486, 492 (2d Cir.1988) (quoting *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1137 (2d Cir.1979)); *Centaur*, 830 F.2d at 1228; *see also Grotrian, Helfferich, Schulz, Th. Steinweg Nachf v. Steinway & Sons*, 523 F.2d 1331, 1339 (2d Cir.1975) (care exercised by consumers in purchase of high priced pianos could not eliminate likelihood of confusion). Cohen's testimony, *supra* p. 409, ineluctably supports this conclusion as far as any likelihood of confusion between the Dove and Swan is concerned.

*Reverse Confusion*

Confusion ordinarily means that consumers misperceive the source of the second comer's goods. Here, consumers are likely to believe that the Swan lamps were actually original Dove lamps. The Lanham Act protects against this very kind of confusion. Thus, the Lanham Act's reach, so far as this case is concerned, is to prevent KI from appropriating PAF's reputation, *see* Tr. 83, 310, limiting its expansion, or causing PAF a loss of patronage. Tr. 226–232; *Banff, Ltd. v. Federated Dept. Stores*, 841 F.2d at 490.

Reverse confusion, on the other hand, is the misimpression that the second comer (KI) is the source of the original product. Such confusion would exist where consumers who first encounter the Swan, then later encounter the Dove and mistakenly believe PAF to be an unauthorized infringer. This can definitively injure PAF's reputation and impair its good will. In *Banff*, the Second Circuit explicitly held reverse confusion actionable under § 43(a) of the Lanham Act. *Id.* at 490–91; *see also Yarmuth–Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d at 995; *cf. Lobo Enterprises, Inc. v. Tunnel, Inc.*, 822 F.2d 331, 333 (2d Cir. 1987) (threat of irreparable harm can be great where a new mark is introduced with great fanfare); *Plus Prods. v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1003–04 & n. 6 (2d Cir.1983) (senior user's reputation for high quality goods may be damaged by junior user's "bargain basement" image).

## II

On August 16, 1988 KI, after having sold most of its Swan lamps and being notified by PAF of a potential infringement suit, sent hang tags inscribed with the "KI" logo to its distributors and a letter with instructions that the KI hang tags were to be prominently displayed on the Swan lamps. *See* DX 11. This action by KI, however, does little to eliminate any likelihood of confusion. As the Second Circuit stressed in *LeSportsac:*

> The proposed hangtag would be removable. Once the tag comes off, the bags are again virtually identical and likelihood of confusion remains. Moreover, as [plaintiffs] correctly point out, the equities are quite different than they would have been had [defendants] placed the proposed tags on the bags when they were first offered for sale.

754 F.2d at 80.

The Swan is sold in a box that has KENROY INTERNATIONAL printed in large letters on the outside of the box. Tr. 393. The record, though, indicates that retail lighting stores always display lamps for sale without the box. Tr. 140, 307, 336. Defendants, therefore, propose to modify the Swan and contend that by embossing, in raised black letters, a "KI" logo, *see* DX 6–A, onto the base of the lamp, defendants will avoid any likelihood of consumer confusion as to the source of its product. Hence, maintain defendants, even if the Swan is sold outside the box, the logo would be sufficient to identify KI as the source of the lamp.

In support of this proposition, defendants cite a number of cases holding that a newcomer can, in the absence of patent protection, copy another's product so long as it obviously labels the product as its own. *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1446 (Fed.Cir.1984) (name displayed in three places on microwave oven enough to eliminate confusion); *Fischer Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 194–95 (1st Cir. 1980) (name and logo prominently displayed on stove door eliminates any likelihood of confusion); *Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304, 310 (2d Cir.1972) (manufacturer's initials clearly displayed

on speakers eliminates likelihood of confusion); *Artemide SpA*, 672 F.Supp. at 711; *Sunbeam*, 635 F.Supp. at 633 (compact food processor properly labeled will avoid any likelihood of confusion).

But under the facts of this case, defendants' argument is at best specious, and defendants' reliance on case law is misplaced. In none of the cases cited by defendants was the trade dress being considered highly distinctive or had acquired secondary meaning. *See, e.g., Schwinn Bicycle*, 678 F.Supp. at 1347. In both *Sunbeam* and *Fischer Stoves*, the product's overall design was held to be functional. *Litton* never ruled on the issue of secondary meaning. Moreover, the court observed that "ordinary users of microwave ovens are accustomed to seeing the maker's or brand name conspicuously placed for their edification, and distributors and dealers must suppose that this information is important to the customer." 728 F.2d at 1446. Here, however, there is no evidence that consumers associate KI with Kenroy International. In point of fact, Mr. Steinberg testified that to his retail customers a KI logo would mean nothing. Tr. 309. And as Lowy aptly pointed out, consumers could easily mistake a KI logo for Koch & Lowy. Tr. 143.

As observed in *Artemide SpA,* the court must look at both the type of product and the prominence of the label. 672 F.Supp. at 711. While a label may help in great degree to distinguish products whose designs are fairly commonplace, (microwave ovens and food processors are not a hotbed for design) in a situation, as here, where the trade dress is distinctive and the products so closely resemble each other, labeling cannot preclude the possibility that confusion will occur. Consumers may be drawn initially to the infringing product precisely because its trade dress so closely resembles that of the other product. This is especially the case where a product has already acquired secondary meaning. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 872–75 (2d Cir.1986) (regardless of labeling, post sale confusion as to source is enough to warrant protection under the Lanham Act, especially where the consumers are sophisticated); *Harlequin Enterprises Ltd. v. Gulf & Western Corp.,* 644 F.2d 946, 949–50 (2d Cir.1981); *Schwinn Bicycle,* 678 F.Supp. at 1348; *Source Perrier S.A. v. Saratoga Springs, Inc.,* 217 U.S.P.Q. 617, 619–20 (S.D.N.Y.1980).

Additionally, the KI logo itself is inconspicuous. Defendants propose to emboss black lettering on a black base. However, even were the logo to contrast with the base, the consumers' initial reaction, of course, would be to the lamp itself, not the logo. In such instances, consumers could unwittingly look at a Swan and conclude it is the original Dove, or at the very least, "that Italian lamp." That is enough to warrant § 43(a) protection.

When it comes to trademark infringement, consumer perception is all important. Where the product in question is distinctive and has acquired secondary meaning, merely because the second comer places its logo on a confusingly similar product does not ameliorate the likelihood of confusion. "In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market. The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinemas Ltd.,* 604 F.2d 200, 204–05 (2d Cir.1979), *quoted in Camp Beverly Hills, Inc. v. Camp Central Park, Inc.,* 217 U.S.P.Q. 783, 785 (S.D.N.Y.1982).

Because none of the lamps sold by KI presently bear the logo, defendants' proposal for a modification of the lamp shall be treated as an application for relief from this court's order enjoining defendants from future sales of the Swan. To prevail on this motion, there is a heavy burden on defendants to come forward with evidence sufficient to demonstrate that the proposed modification would significantly reduce the likelihood of consumer confusion. *See Home Box Office, Inc. v. Showtime/The Movie Channel Inc.,* 832 F.2d 1311, 1315–16 (2d Cir.1987). Plainly, defendants have not met this burden. In light of the fore-

going discussion, the court finds that defendants have made no showing, other than to merely suggest, that a KI logo will significantly reduce a likelihood of confusion.

*State Law Claims*

■ Plaintiffs also seek relief under N.Y.Gen.Bus.Law § 368–d for dilution of a trademark and a common law claim of unfair competition. The New York statute is inapplicable in this case because the products involved are similar and competitive. *Aris–Isotoner Gloves, Inc. v. Fownes Bros. & Co.*, 594 F.Supp. 15, 24 (S.D.N.Y.1983). The common law claim differs from the federal claim in that under New York law proof of secondary meaning is not always required to obtain relief for trade dress infringement. When a defendant's conduct has transparently involved an attempt to profit at the expense of the plaintiff, New York courts have deemed the conduct unfair competition even when plaintiff's trade dress has not acquired secondary meaning. *815 Tonawanda St. Corp.*, 842 F.2d at 649;

*20th Century II*, 815 F.2d at 11; *Harlequin Enterprises*, 644 F.2d at 950; *Perfect Fit Indus., Inc.*, 618 F.2d at 952–54.

The court, having already decided the federal claim, need not reach the state claim.[19]

### III

Upon balancing the equities, the court readily reaches the conclusion that plaintiffs would suffer much more than defendants were an injunction not to issue. The Dove represents 60 percent of PAF's business, and essentially, has come to be the symbol of PAF. Admittedly, the Swan comprises but merely 0.7 percent of KI's total sales. Tr. 346.

In short, plaintiffs have established that prospective purchasers are likely to be confused as to the source of the Swan, and as a result, are entitled to permanent injunctive relief. Accordingly, Kenroy International and all other divisions of Hunter-

**19.** Defendants have made much of PAF's failure to acquire a design patent for the Dove. As pointed out *supra* note 15, plaintiffs are presently ineligible for design patent protection in this country. In light of the recent Supreme Court decision in *Bonito Boats, Inc. v. Thunder Craft Boats*, —— U.S. ——, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989), the question of how far New York's law of trade dress protection extends to products that are potentially the subject matter of design patents is left unanswered. While *Bonito Boats* recognizes that not all state regulation of potentially patentable trade dress is *ipso facto* preempted by federal patent laws, the Court also concluded that "[s]tates may not offer patent like protection to intellectual creations which would otherwise remain unprotected as a matter of federal law." *Id.* at —— – ——, 109 S.Ct. at 980. Because New York law does not require proof of secondary meaning in all instances, and because in cases of product designs federal law always requires proof of secondary meaning, *Union Mfg. Co.*, 763 F.2d at 48, in cases where the trade dress in question is the product design, state law may in some cases be preempted by the federal patent laws. *See, e.g., Metro Kane Imports, Ltd. v. Rowoco, Inc.*, 595 F.Supp. 702, 707 (S.D.N.Y.1984) (Metro I) (citing *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231, 84 S.Ct. 784, 789, 11 L.Ed.2d 661 (1964)), *aff'd mem.*, 800 F.2d 1128 (2d Cir.1986).

In this case, however, preemption is not an issue. Although some courts have refused to extend trade dress protection in cases of product simulation, *see Sublime Prod., Inc. v. Gerber Prod., Inc.*, 579 F.Supp. 248, 251 n. 4 (S.D.N.Y.

1984), claims based upon a situation, as here, where the defendant has attempted to palm off his goods as those of the plaintiff are not preempted because they either go beyond or are not equivalent to federal copyright and patent laws. *See Towle Mfg. Co. v. Godinger Silver Art Co.*, 612 F.Supp. 986, 995 (S.D.N.Y.1985) (citing *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 237, 84 S.Ct. 779, 781, 11 L.Ed.2d 669 (1964)). Judge Weinfeld addressed this very issue in *Gemveto Jewelry Co. v. Jeff Cooper, Inc.*, 613 F.Supp. 1052, 1063–64 (S.D.N.Y.1985), *vacated on other grounds*, 800 F.2d 256, 259 (Fed. Cir.1986), and characteristically Judge Weinfeld provided the answer:

Were Gemveto's claim predicated solely upon [defendant's] having copied plaintiff's jewelry designs, the claim perhaps would be preempted by the federal law. However, it is not merely product simulation, but predatory practices that are the basis of injunctive relief....

*Id.; see also Ippolito v. Ono-Lennon*, 139 Misc. 2d 230, 526 N.Y.S.2d 877, 883 (1988). It is worth noting that the decision in *Sublime Prod., Inc. v. Gerber Prod., Inc.*, 579 F.Supp. at 251 n. 4, was rendered previous to a number of Second Circuit decisions that eventually extended trade dress protection to product designs. *See Brandir Int'l*, 834 F.2d at 1148; *LeSportsac*, 754 F.2d at 75.

For a related discussion on the issue of design patents *see supra* notes 9, 15, and *infra* note 21.

Melnor, Inc., DAC Wire Corp., their officers, agents, employees, successors and assigns, and all other persons in active concert with them, are permanently enjoined from importing, manufacturing, marketing, distributing, selling or offering for sale the Swan or any lamp resembling the Swan which includes the following features: (1) curvilinear struts of the kind resembling those used in the Dove; (2) a long flat arm with the shape or dimensions of that used in the Dove; (3) the distinctive shape head of the Dove.

The court, having decided that plaintiffs are entitled to permanent injunctive relief, now considers plaintiffs' other requests in their prayer for relief. Plaintiffs request a recall of all lamps sold by KI. A recall would be problematic. Among other difficulties, more than six months have passed since the last sale of a Swan by KI. Not only would it be virtually impossible to attempt to collect all the scattered lamps, but there is no assurance that all customers of KI would comply with the request. Therefore, the request for a recall is denied.

Plaintiffs further seek under section 35, 15 U.S.C. § 1117(a), compensatory damages, an accounting of defendants' profits, attorney's fees and costs in this action.[20] Although likelihood of confusion is all that is required for injunctive relief, proof of

actual confusion is necessary to recover damages under § 43(a) of the Lanham Act. *PPX Enter., Inc. v. Audio Fidelity Enter., Inc.*, 818 F.2d 266, 271 (2d Cir.1987) (citing *Warner Bros. v. Gay Toys, Inc.*, 658 F.2d 76, 79 (2d Cir.1981)). Plaintiffs presented no evidence of actual confusion. Consequently, the request for damages is denied.

■ An accounting of defendants' profits and an award of attorney's fees are appropriate where there is a finding of deliberate and willful infringement. *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 113 (2d Cir.1988) (citing *Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 356 (2d Cir. 1983)); *Banff v. Federated Dept. Stores*, 841 F.2d at 493–94; *Sunset Lamp Corp. v. Alsy Corp.*, 698 F.Supp. 1146, 1154 (S.D.N.Y.1988). The uncontradicted and credible proof of intentional copying in this case is evidence of KI's bad faith [21] and makes this case an exceptional one under § 43(a), meriting an award of both KI's profits and attorney's fees. In addition, plaintiffs need not prove actual damages to obtain defendant KI's profits, *see Burger King Corp. v. Mason*, 855 F.2d 779, 781 (11th Cir.1988) (citing *Wolfe v. National Lead Co.*, 272 F.2d 867, 871 (9th Cir.1959) (court rejected defendant's good faith defense to an accounting for profits where, similarly, de-

---

**20.** Section 35 of the Lanham Act, 15 U.S.C. § 1117(a), applies to section 43(a) actions, 15 U.S.C. § 1125(a). *NuPulse, Inc. v. Schlueter Co.*, 853 F.2d 545, 550 (7th Cir.1988); *Centaur*, 830 F.2d at 1229.

**21.** KI contends that as evidence of its good faith it did a patent search on the Dove which uncovered no evidence of a design patent. Thus, Gomes testified: "I thought that [sic] the fact that no patent existed ... put me in a position where I could sell this [Swan] based on the patent laws without any fear of litigation." Tr. 396. However, as evidenced by his August 9, 1988 memorandum to LTS, *see* PX 155, and contrary to his August 16, 1988 letter to KI distributors, *see* DX 11 (which the court regards as a self-serving declaration having little probative value), Gomes was unaware of this fact at the time he started selling the Swan (KI sold its first Swan at the Dallas Trade Show on July 7, 1988, *see* Tr. 395). Also, Gomes was placing additional orders with LTS, *see* PX 152, after he had been made aware of the legal theory of

trade dress protection and had voiced concerns that he might be sued by the owners of the Dove. *See* DX 1 at 76–79, 103.

Additionally, KI argues that because its initial shipping order to LTS was subject to an irrevocable letter of credit, the company had to sell the Swans or face a loss. Tr. 401–03. Contrary to KI's position, this concern over profit is indicative more of bad than of good faith. Gomes made no attempt to either cancel the letter of credit or transfer the money to other already existing accounts. Tr. 403. He testified, "Why would I? I was anxious to receive these [Swans]." *Id.* Furthermore, KI continued to sell its remaining stock of Swan lamps after having received a cease and desist letter from plaintiffs' attorneys. Tr. 416–19. Finally, judging from PX 153 and DX 1 at 84–86, (implying that KI was shipping lamps from Italy to be used as samples for the products that LTS would then make) and from the court's opportunity to observe the witnesses at trial, the court concludes Gomes' assertion of good faith in this matter lacks credibility.

fendant had consulted an attorney who advised defendant that he was not an infringer), *cert. denied*, 362 U.S. 950, 80 S.Ct. 860, 4 L.Ed.2d 868 (1960), *overruled on other grounds, Maier Brewing Co. v. Fleischman Distilling Corp.*, 359 F.2d 156, 165 (9th Cir.1966)); *Burndy Corp. v. Teledyne Industries, Inc.*, 748 F.2d 767, 772 (2d Cir. 1984).

Moreover, in the instant case an accounting is unnecessary. Of the 4500 lamps that KI ordered from LTS, it sold 1500. Tr. 397, 399; DX 1 at 137. The other 3000 lamps have not yet entered the United States and perhaps may not have even been manufactured. DX 1 at 139–41. Of the 1500 lamps sold, fourteen have been returned. *Id.* at 137–38. KI used a scaled pricing system in its sale of the Swans. For one lamp the price was $72; for lots of twelve the price was $65; and for lots of twenty-four the price was $60. Tr. 398–99; PX 165. The lamps cost KI $32.50 f.o.b. Taiwan. Gomes testified that the average price per lamp was $62, that his landed cost was actually closer to $40, Tr. 399, and estimated "pretty much to formula" that after agents' commissions KI's gross profit on the unit price would be around $24. DX 1 at 55–57.

The court, exercising its broad powers of discretion in this area, calculates KI's profits as follows: Assuming as Gomes stated, all the Swans were sold for an average price of $62 and KI's landed cost was $40 per lamp, KI's profit would be $22 per unit. Multiplying 1500 units by $22 profit per unit yields a total of $33,000, and minus $308 for the fourteen returns, equals $32,-692.

As for attorney's fees, the parties may stipulate as to reasonable attorney's fees. In the event the parties cannot reach an agreement, plaintiffs will submit within twenty days from the date hereof an affidavit including a contemporaneous time sheet documenting the number of billable hours for this case and a reasonable request for payment thereof. *Lewis v. Coughlin*, 801 F.2d 570, 577 (2d Cir.1986). Defendants will have the opportunity to respond within twenty days after receipt of plaintiffs' affidavit and documentation.

## CONCLUSION

The Dove lamp is a highly distinctive, aesthetically appealing and award winning lamp. Its design features are not predominantly functional. Plaintiffs have provided sufficient evidence to demonstrate the Dove has acquired secondary meaning among the relevant consumer group, which consists of designers, decorators, architects, and sophisticated upscale consumers.

Plaintiffs adduced adequate evidence that consumers are likely to be confused as to the source of the Swan. Therefore, permanent injunctive relief is granted to plaintiffs. Plaintiffs are also entitled to an award of KI's profits amounting to $32,-692., reasonable attorney's fees, and the costs of this action.

The foregoing constitutes the court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

Submit judgment.